# FIRST NATIONAL BANK OF ARIZONA *v.* CITIES SERVICE CO.

No. 23.   Argued November 9, 1967.—Decided May 20, 1968.

Let me look carefully. There's a black bar at top, then "255" to the right. Then more black bars (redacted content). This is a heavily redacted document page.

The only visible text is "255".

*William E. Kelly* argued the cause for petitioner. With him on the briefs were *David Orlin, Preben Jensen,* and *Alan R. Wentzel.*

*Simon H. Rifkind* argued the cause for respondent. With him on the brief was *Edward N. Costikyan.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

At issue in this case is the propriety of an award of summary judgment in favor of respondent Cities Service in a treble-damage antitrust action. The District Court held there was no genuine issue as to material facts between the parties and that respondent was entitled to

judgment as a matter of law. 38 F. R. D. 170 (D. C. S. D. N. Y. 1965). The Court of Appeals for the Second Circuit affirmed. 361 F. 2d 671 (1966). This Court granted certiorari, 385 U. S. 1024 (1967), to determine whether the decisions below were in conformity with *Poller* v. *Columbia Broadcasting System, Inc.*, 368 U. S. 464 (1962). We conclude that *Poller* and other decisions of this Court were correctly applied and, accordingly, we affirm.

Because the question whether summary judgment is appropriate in any case is one to be decided upon the particular facts of that case, we shall set forth the background of this litigation in some detail (Part I) before turning to the specific issues petitioner raises (Parts II–V).

## I.

On June 11, 1956, petitioner Waldron [1] filed a private antitrust complaint in the Southern District of New York against seven large oil companies: British Petroleum Co., Ltd. (formerly Anglo-Iranian Oil Co.), Gulf Oil Corp.,[2] Socony Mobil Oil Co., Standard Oil Co. of California, Standard Oil Co. of New Jersey, The Texas Co., and Cities Service Co. The complaint contained essentially two series of allegations. The first was copied from the complaint in a then-pending civil action by the United States against those defendants other than Cities Service, alleging the formation and maintenance by them of a worldwide oil cartel since 1928. The second series of allegations dealt specifically with a conspiracy claimed to have been entered into at the time

---

[1] Plaintiff, Gerald B. Waldron, died in November 1964. His executor has been substituted as the petitioner. We shall refer to both Waldron and the executor as "petitioner" or "Waldron" interchangeably.

[2] Gulf subsequently settled with petitioner and is no longer a party defendant, although it remains as an alleged co-conspirator.

of the nationalization of the properties of the Anglo-Iranian Oil Co. by the Government of Iran in May 1951. The defendants other than Cities Service, it was asserted, agreed at that time to boycott Iranian oil in all world markets until Iran should agree to return Anglo-Iranian's property and concession rights. While the dispute between Anglo-Iranian and the Iranian Government under Premier Mossadegh was still continuing, Waldron and some of his associates allegedly succeeded in obtaining a contract to purchase 15,000,000 metric tons of crude oil or refined products from the National Iranian Oil Co. (NIOC), the company formed to take over Anglo-Iranian's nationalized properties, over a five-year period at a rate substantially less than the then current posted price for Persian Gulf oil. NIOC in return agreed not to deal with anybody other than Waldron in the United States market.

The complaint next stated that the defendants other than Cities Service conspired to prevent petitioner from selling any of the oil to which he was entitled under his contract with NIOC. It was further alleged that Cities Service, after first engaging in extensive negotiations with Waldron with an eye toward participating in the operation of the Iranian oil industry, broke off dealing and joined the conspiracy to boycott him as a result of having received what amounted to a bribe from Gulf and Anglo-Iranian, namely, a large supply of oil from Kuwait at a price even lower than that petitioner could offer Cities pursuant to his contract with NIOC. Finally, the defendants were alleged to have entered into a Consortium Agreement in 1954, pursuant to their attempt to monopolize Middle East oil production, which parceled out substantially all the Iranian oil production between them. Cities Service was claimed to have been permitted to purchase a share in the Consortium. Petitioner asserted that the boycott conspiracy

carried out by all the defendants completely frustrated his ability to sell oil under his contract and accordingly sought treble damages from them in the amount of $109,000,000.

Within the time set for the defendants to answer the complaint, various of them moved to take petitioner's deposition, and all of them moved to postpone the filing of their answers until the completion of that deposition. The motions were accompanied by affidavits of counsel that the legal questions presented by the complaint were extraordinarily complex and that they had insufficient information about petitioner's business dealings with the Iranian Government to permit them adequately to prepare their clients' answers within the 20-day time limit set by Rule 12 (a) of the Federal Rules of Civil Procedure. These motions were granted by Judge Weinfeld, who, in addition, stayed petitioner from any discovery of his own until completion of the defendants' discovery, apparently pursuant to then existing practice in the Southern District.[3]

The deposition of Waldron commenced on September 10, 1956, and continued until July 3, 1957, at which time petitioner's counsel announced his intention to limit further examination. Nothing further was done by any party until December 30, 1957, at which time a motion was made to terminate the taking of Waldron's deposition. By this time 62 days' testimony had been taken over a period of more than 15 months. All adjournments up to this point were either at Waldron's request or with his consent. Meanwhile, various of the defendants had noticed the depositions of petitioner's associates, Richard S. Nelson, James A. Bentley, James E. Zoes, Ray Carter, and Addison Brown, in October and November 1956. Pursuant to successive stipulations en-

---

[3] This practice has since been changed by rule. See 4 Moore, Federal Practice ¶ 26.13 [3], at 1154 (2d ed. 1967).

tered into between petitioner and the defendants, the taking of these depositions had been postponed up to the date of petitioner's motion to terminate the taking of his own deposition. In that motion petitioner also moved to vacate the notices to take depositions of his associates.

In response to petitioner's claims that the protracted examination of him by the defendants constituted harassment and an undue burden on him, the defendants pointed out that only one of their number had as yet examined Waldron and that the length of time over which the examination had proceeded had been with his complete acquiescence. As for petitioner's financial hardship contention, the defendants suggested that, in view of the damages sought by petitioner, it was not inappropriate that he be required to spend considerable time clarifying his claims before trial. Judge Herlands denied the motion on February 11, 1958, after argument; he ordered, however, that further examination of the petitioner by the seven defendants be limited to 52 working days, of which 10 were allotted to respondent Cities Service. In addition 174½ days were scheduled for the examination of Waldron's five associates, of which 31 went to Cities Service. The examinations were to be consecutive and were set to commence on March 10, 1958, unless the parties agreed otherwise. The defendants were authorized to postpone the filing of their answers until 30 days after the completion of the depositions, and petitioner was stayed from undertaking any discovery proceedings of his own during that period.

Pursuant to stipulation the continued examination of petitioner did not resume until September 15, 1958, and was not terminated until October 1959. Twenty-six days were spent deposing Waldron in the latter part of 1958 and only six days during all of 1959, of which 3½ were utilized by counsel for Cities Service. Petitioner's

associates were deposed between January 1960 and April 1962 for 58 working days, of which 3½ were used by counsel for Cities Service. Waldron was then examined for one additional day in 1962.

Thus, between September 1956 and May 1962, a period of over 5½ years, Waldron and his associates were deposed for a total of 153 days, of which only seven days were attributable to Cities Service. The various stipulations that resulted in prolonging the period required for the taking of these depositions were all entered into either at the request, or with the agreement, of petitioner.

During the course of his deposition by Cities Service, Waldron stated that he had at first not attributed Cities' failure to conclude some sort of a deal with him for Iranian oil to its participation in the boycott. He explained that it was his discovery of Cities' purchase of substantial amounts of Kuwait oil from Gulf, plus its subsequent participation in the 1954 Consortium, that prompted him to join it in his complaint as a member of the conspiracy. Accordingly, when Cities moved for summary judgment in its favor in 1960, it did so on the ground that the affidavit of Cities' Senior Vice President in Charge of Foreign Operations, George H. Hill, and the accompanying documents from Cities' files that were submitted in support of the motion conclusively disproved petitioner's theory that it had joined the alleged boycott conspiracy because it had been bought off by the other conspirators.

In brief, the documents demonstrated that Cities had been engaged in negotiations with Gulf [4] to purchase Kuwait crude oil since 1948, and that a substantially final agreement, although not the actual conclusion of a con-

---

[4] Anglo-Iranian was a co-owner of the Kuwait Oil Co., the actual holder of the entire Kuwait oil concession, but does not appear to have participated in the negotiations with Cities.

tract, had been reached on the proposed deal prior to the time petitioner first approached Cities.[5]   As for the Consortium, the documents showed that Cities had only commenced negotiations with the defendants to obtain participation therein some two years after it was alleged to have joined the conspiracy and that the share it was eventually offered, over its strenuous objections, was so small that it transferred the share to the Richfield Oil Co., in which it held a minority stock interest.

In reply to Cities' motion, petitioner's counsel reiterated his contention that the course of dealings between Waldron and his associates, on the one hand, and various of Cities' executive personnel, especially its president, W. Alton Jones, on the other, raised an inference of conspiracy because the most probable conclusion to be drawn from Cities' decision to pass up the assertedly extremely beneficial deal proposed by petitioner, notwithstanding its need for additional supplies of imported oil, was that in some manner Cities either had been "reached" or had used its negotiations with Waldron as a means of forcing its way into the alleged Middle East oil cartel.   Petitioner also suggested that Cities might well have made some sort of informal agreement with the other defendants concerning the Consortium that was not revealed by the documents and that Cities might have expected, at the time such an agreement was made, a more profitable share therein than it was eventually offered.

In response to these arguments, Judge Herlands, who had by this time been assigned to the case for all

---

[5] Petitioner argues that a "most-favored-nations clause" was inserted at the last minute for the benefit of Cities. The record reveals that the so-called clause was simply a unilateral declaration from Gulf in the form of a letter from its chairman of the board that in the event of future price changes its policy would be to give Cities the benefit of the better price.

purposes, handed down a memorandum decision on March 30, 1961, postponing determination of Cities' motion for summary judgment. In his opinion Judge Herlands stated that it was "doubtful" whether any issue as to any material fact existed and that Cities had been named a defendant on mere "suspicion." Because he judged petitioner's claim against Cities "so insubstantial," he ruled that petitioner would not be given "carte blanche authority to conduct untrammeled pre-trial proceedings," but that such proceedings would be "closely regulated." Subsequently, Judge Herlands entered an order providing that petitioner was to be allowed to take the deposition of Hill, the Cities' executive who had been in charge of negotiating the Kuwait deal with Gulf and who had also carried out Cities' attempts to secure a participation in the Consortium.

At the hearing in 1961 on the proposed order to implement the court's decision, counsel for Waldron asked to depose Cities' president Jones first. Contrary to what appears to be the position taken now, petitioner acknowledged and accepted Judge Herlands' order that his discovery of Cities was to be carried out pursuant to Rule 56 (f), Fed. Rules Civ. Proc., which provides for comparatively limited discovery for the purpose of showing facts sufficient to withstand a summary judgment motion, rather than Rule 26, which provides for broad pretrial discovery. Petitioner's sole objection to the proposed order was that Jones should be deposed rather than Hill.

In response to Judge Herlands' observation that Hill was the man who was in the best position to provide information about the two alleged facts relied on in the complaint to link Cities to the conspiracy, petitioner's counsel for the first time argued that the Kuwait deal and the Consortium agreement were not crucial to the case. While maintaining the position that those two items were significant, counsel stated that Cities' motive

for entering the alleged conspiracy was basically irrelevant. He argued that the evidence showed that Cities had embarked on a course of dealing with Waldron and then inexplicably had broken it off, and that this sequence of events was in itself sufficient evidence of conspiracy to withstand summary judgment and to entitle petitioner to sufficient discovery to ascertain the reason for the breakoff.

This argument was rejected and the trial judge clearly stated that to withstand summary judgment petitioner would have to produce some factual evidence of conspiracy beyond Cities' mere failure to carry through on a deal for Iranian oil. The taking of Hill's deposition was scheduled, without objection by petitioner, to commence upon the completion of the depositions of petitioner's associates.

More than a year then elapsed, during which time, again pursuant to stipulations between all the parties, only 25 days were spent taking the depositions of petitioner's associates. Immediately after the completion of these depositions, in response to motions to strike portions of the complaint made by various defendants other than Cities, petitioner announced his intention to amend his complaint and entered into a stipulation with the other parties extending their time to move or answer until 30 days after service on them of the amended complaint. This stipulation was entered into on June 1, 1962, approximately 30 days prior to the time by which, under Judge Herlands' previous order, the defendants would have been required to answer the complaint or move for summary judgment. Some five weeks later, at the request of petitioner's counsel, a new stipulation was entered into postponing the taking of Hill's deposition until September 10, 1962, and staying petitioner's undertaking to file an amended complaint pending completion of the Hill deposition.

Between September 10, 1962, and February 27, 1963, pursuant to stipulations between the parties, petitioner deposed Mr. Hill for a total of six working days. Then, at the beginning of May, petitioner moved for additional discovery. In response to this motion respondent Cities Service renewed its summary judgment motion in addition to opposing further discovery by petitioner. At oral argument on May 27, 1963, Judge Herlands reiterated his opinion that thus far Waldron was still unable to point to any facts tending to show that Cities had participated in the alleged conspiracy. Indeed, the deposition testimony of Hill, plus various additional documentary evidence supplied in connection therewith, had further disproved the Kuwait and Consortium pay-off theories. This evidence showed that Cities had actively resisted formation of the Consortium by the other defendants, even to the extent of making approaches to the United States Government in the hope of securing its intervention in the situation.

While the respective motions were pending before Judge Herlands, petitioner on June 28, 1963, filed an amended complaint. It differed from the original complaint in that most of the specific facts alleged in the original were replaced by more general allegations of conspiracy and boycott. In regard to Cities, the complaint was amended to omit all reference to any factual allegations involving either Kuwait oil or membership in the 1954 Consortium. In addition, those allegations of the original complaint which were directed at the other defendants and which had specifically excluded Cities were made more general, and the language excluding Cities was replaced by language referring simply to unspecified co-conspirators. In place of the previous specific allegations directed at Cities, the amended complaint substituted two new formulations: first, a general allegation that Cities joined the conspiracy at a

time and in a manner not known to the plaintiff; and, second, that the other defendants and various of their co-conspirators "secretly threatened, induced and conspired with defendant Cities Service to break off all dealings with plaintiff."

Judge Herlands held petitioner's and Cities' cross-motions under advisement for a little more than a year while he considered motions for summary judgment against petitioner made by the other defendants. Then, on June 23, 1964, in a long and comprehensive opinion dealing with both sets of motions, he denied the motions for summary judgment made by the other defendants, again postponed final disposition of Cities' motion and granted Waldron the opportunity to conduct further discovery of Cities under Rule 56 (f).[6] Presumably, decision on petitioner's motion was deferred so long because, had the motions of the defendants other than Cities for summary judgment been granted, petitioner's case against Cities would have also been terminated. In any event, the order implementing the decision permitted petitioner to depose all those members of Cities' executive staff then alive[7] who he alleged had participated at all in the dealings concerning Iranian oil, namely, Burl S. Watson, Cities' chairman of the board, Alfred P. Frame, Cities' first vice president, and J. Edgar Heston, Cities' manager of oil production. The order also directed Cities to produce all documents and memoranda relating to (a) the Kuwait and Consortium issues, (b) conversations and communications between it and any other defendant between June 11, 1952, and October 1, 1952, concerning petitioner, his asso-

[6] 231 F. Supp. 72.

[7] Cities' president, W. Alton Jones, died in an airplane crash on March 1, 1962. Three other Cities' executives who had participated in varying degrees in Cities' exploration of the possibility of purchasing Iranian oil had also died by this time.

ciates, and Cities' dealings in connection with Iranian oil, (c) conversations and communications between Cities and any other defendant between June 11, 1953, and September 30, 1953, pertaining to negotiations between Waldron and the Richfield Oil Corp. concerning the purchase by Richfield of Iranian oil, and (d) conversations and communications between any deponent for Cities and any other Cities' employee involving the subject matter described in the preceding categories. The depositions of the three Cities' executives were completed during the months of July and August 1964 and in connection therewith more than 140 documents were produced.

In September 1964 petitioner moved for the following additional discovery: first, the production of all documents in the possession of Cities dealing with Cities' activities in connection with Iranian oil between June 1952 and January 1955; second, the production of all documents relating to the same subject matter in the possession of the other defendants; and third, the production of all relevant documents from, and oral examination of, Ray Carter, a former Cities employee who had acted as an intermediary between Cities and petitioner in their dealings. Petitioner further indicated a desire to depose various unspecified officials of the other defendants after the completion of the discovery detailed in his motion. Immediately thereafter, in October 1964, Cities for the third time renewed its motion for summary judgment [8] and argument was had on both

---

[8] Although petitioner's discovery motion preceded respondent's renewal of its summary judgment motion, it is evident that petitioner's motion was made with full knowledge that a renewal of respondent's motion would soon be forthcoming. In a very real sense it was thus a response to the summary judgment motion and was intended to serve as a ground for arguing that the motion should not be granted.

motions in February 1965. Judge Herlands granted Cities' motion on September 8, 1965, holding that petitioner had failed to fulfill the requirement of amended Rule 56 (e) that a party opposing a properly supported summary judgment motion must produce by affidavit or otherwise "specific facts showing that there is a genuine issue for trial." [9] As to petitioner's cross-motion for additional discovery under Rule 56 (f), the court ruled that petitioner's total failure by that date to produce any evidence tending to show Cities' participation in a conspiracy to boycott him, despite considerable discovery, demonstrated that additional discovery would be merely a fishing expedition and would unduly harass respondent. The Court of Appeals for the Second Circuit affirmed the judgment of the District Court in all particulars.[10]

Petitioner states that three questions are presented by this case: first, whether he was improperly limited in the discovery permitted him prior to the rendering of summary judgment (Parts II, V, *infra*); second, whether sufficient material facts to raise genuine issues for trial were shown (Part III, *infra*); and third, whether the lower courts held, erroneously, that amended Rule 56 (e), Fed. Rules Civ. Proc., places the burden of showing that there is a genuine issue of material fact for trial on the party opposing a motion for summary judgment (Part IV, *infra*).

## II.

We turn first to one aspect of petitioner's contention that his discovery was unduly restricted: whether certain orders of the trial judge imposed unfair limits on his access to relevant information. The second aspect of petitioner's discovery argument, addressed to what he viewed as the necessity for additional discovery to enable

---

[9] 38 F. R. D. 170.
[10] 361 F. 2d 671 (1966).

him adequately to oppose the summary judgment motion, we shall discuss in Part V of the opinion.

Petitioner's initial complaint, as set out more fully, *supra,* at 259–261, specifically alleged that Cities had adhered to the conspiracy by refusing to deal with petitioner after being bought off by the Kuwait contract and an opportunity to participate in the Consortium. Similarly, in his deposition, Waldron reiterated his belief that the only links between Cities and the conspiracy were those two payoffs. Thus, by petitioner's own doing, respondent Cities Service was from the beginning of the litigation placed in a vastly different position from the other alleged co-conspirators. Cities, realizing this, apparently felt that if it could show that it had in fact not received any payoff or bribe from the other defendants, petitioner would abandon his contention that it had joined the alleged conspiracy. Accordingly, immediately after it had taken Waldron's deposition, Cities made its motion for summary judgment accompanied by Hill's affidavit and the supporting documents described, *supra,* at 263–264. When Judge Herlands declined to grant Cities' motion at that time, he permitted petitioner to examine Cities about those specific facts that had theretofore been the only ones alleged as evidence of conspiracy on the part of Cities, other than its failure to make a deal with petitioner for Iranian oil. Petitioner appears to argue that it was erroneous for the trial court to limit his discovery initially to Hill rather than Jones, the person with whom he primarily dealt. However, since petitioner was the party who had injected Kuwait and Consortium into the case and since Hill had been the ranking Cities official in charge of both transactions, it is difficult to conclude that the trial judge abused his discretion in ordering petitioner to begin by examining Hill.

Even assuming *arguendo* that it was error for petitioner to have been required to begin his discovery with Hill rather than Jones, the issue is moot for purposes of appellate review because Jones' accidental death occurred prior to the time petitioner would have been able to commence deposing him had he been permitted by Judge Herlands to do so. There is no reason to believe that petitioner would have made any greater efforts to see that the examination of his associates, Bentley, Zoes, and Brown, was carried out in less than the 13 months that were actually taken had he been scheduled to depose Jones at the end of that time rather than Hill. Obviously it was Jones' death, rather than any action taken by Judge Herlands, that prevented his being deposed at some later date.

Although petitioner had begun to de-emphasize the significance of Kuwait and the Consortium to his claim of conspiracy by Cities at the first argument on Cities' motion for summary judgment, it was not until after the additional information described above was obtained through Hill's deposition, and the supporting documents accompanying it, that petitioner began to stress the contention that Cities had undergone a dramatic shift in its attitude towards him in September 1952, immediately after Jones had returned from a trip to Iran arranged for him by Waldron. While it is probably to overstate the case to say, as does respondent, that petitioner abandoned his Kuwait and Consortium claims at this time, it is fair to say that petitioner no longer seriously contended that the evidence relating to them was sufficient in itself to raise a genuine issue of material fact.

After again declining to grant Cities' motion for summary judgment, Judge Herlands entered an order permitting further discovery of Cities. It provided, as described in more detail, *supra,* at 268–269, for an examination of those Cities executives still alive who participated in

the negotiations between petitioner, Cities, and the Government of Iran. It also directed the production of all documents in Cities' possession relating to any contemplated dealings in Iranian oil during the period of Waldron's active contact with Cities, *i. e.*, between June 11, 1952, and October 1, 1952.[11]

This order had the effect of permitting Waldron to examine every surviving Cities official with whom he had dealt to any substantial degree in his attempts to arrange a sale of Iranian oil. He was permitted to examine them, and have production of all documents in connection therewith, concerning all the events that he had specified in his original complaint or in the two previous oral arguments on Cities' motion for summary judgment as being evidence of Cities' participation in the alleged conspiracy. Certainly the scope of this order, viewed as of the time it was made, does not seem open to any serious challenge as unduly restrictive, and petitioner did not make any such argument at the time the order was proposed. It was only when petitioner moved for additional discovery in the fall of 1964 that he began seriously to complain about the allegedly limited scope of the prior discovery order. Accordingly, we shall postpone more detailed discussion of this point to Part V, *infra*.

Petitioner did argue then, and still contends now, that he was prejudiced by the failure of Judge Herlands to let him examine various other Cities executives, in addition to Jones, at the time he was permitted to depose Hill. He bases this contention on the ground that many of these executives were men of advanced years at that time and that the deaths that in fact ensued[12] could

---

[11] Documents covering internal Cities' discussion of these matters were also ordered to be produced for the period from October 1, 1952, to November 1, 1952.

[12] See n. 7, *supra*.

thus have been reasonably foreseen. The fallacy in this argument is that it was only after Hill testified that petitioner changed the focus of his argument before the trial judge to minimize the significance of Kuwait and Consortium and to suggest other possible motivations for Cities to. conspire. Certainly Judge Herlands was not required to anticipate that petitioner would change the entire factual emphasis of his case so that individuals who did not at the time appear to be particularly vital to the litigation would subsequently become so. Moreover, petitioner did not even ask to depose any Cities official who subsequently died, other than Jones, at the time he was permitted to examine Hill. Therefore, petitioner's claim of prejudicial error here must fail also.

## III.

In his affidavit in support of Waldron's motion for additional discovery, petitioner's attorney detailed the facts produced to date that assertedly showed Cities' participation in the conspiracy, in order both to support his contention that additional discovery was needed and to demonstrate that summary judgment in favor of Cities should not be granted. We shall first discuss the propriety of Judge Herlands' award of summary judgment before dealing further (in Part V) with petitioner's contentions relating to additional discovery.

## A.

When petitioner moved for additional discovery in 1964, in opposition to Cities' still pending motion for summary judgment, his counsel's affidavit pointed . to the following evidence as tending to show a participation by Cities in the alleged conspiracy [13] to boycott his

---

[13] For the purpose of evaluating Waldron's case against Cities, his allegations about a conspiracy to boycott him carried out by the other defendants herein must be taken both as true and as

attempts to resell the Iranian oil to which he allegedly had access under his contract. Cities had a need to import substantial amounts of crude oil for its domestic operations in the United States, this need amounting to some 100,000 barrels per day. Cities had theretofore been unable to obtain an independent oil supply in the Middle East despite its long-existing desire to do so. Through petitioner, Cities had two assertedly attractive possibilities of fulfilling its crude oil needs. The first consisted of short-term purchases of Iranian oil at prices substantially below the going rates for Mideast oil via petitioner's contract with NIOC. The second, in which Cities was apparently more interested and on which tentative agreement with petitioner was allegedly reached, was for Cities to enter into a long-term arrangement to take over the operation of the entire Iranian oil industry (or a substantial portion thereof) in place of Anglo-Iranian, and to compensate Waldron for what would amount to a transfer of his contract rights.

The evidence further showed that Cities went to substantial lengths to explore the possibilities presented by petitioner. Waldron, at Jones' request, secured an invitation for Jones, together with other Cities executives, from Premier Mossadegh to go to Iran to look over the production facilities that NIOC had appropriated from Anglo-Iranian. Upon examination of the facilities, the Cities executives concluded that, notwithstanding the departure of the British personnel who had previously been in charge of operations, the Iranians had managed to keep them in relatively good operating condition. This conclusion was orally presented to Mossadegh by Jones and a comprehensive written report on specific details was promised to be transmitted later. During

legally sufficient. We, of course, intimate no opinion on the merits of petitioner's claims against the other defendants that are still pending below.

his stay in Iran, Jones also made a side trip to Kuwait to visit the Kuwait Oil Company, owned jointly by Anglo-Iranian and Gulf. On the return of the Cities party to the United States, Watson [14] informed petitioner in October 1952 that Cities did not propose to take any steps relative to obtaining Iranian oil, although another Cities executive subsequently indicated to him that Cities had not entirely abandoned its interest in his proposals. However, Cities had no further significant dealings with Waldron thereafter. Meanwhile on September 21, 1952, Carter, acting on petitioner's behalf, had sent a telegram to Secretary of the Interior Chapman offering to sell a cargo of Iranian-produced aviation gasoline to the United States Air Force. Carter stated that Jones had said that he would use his good offices to get the United States to purchase the gasoline. Instead, Jones cabled Watson instructions to tell Chapman that he was disassociating himself from Carter's efforts and that he questioned the wisdom of Carter's proposal. This Watson did.

Subsequently, in January 1953, Jones wrote to the incoming Secretary of State and Attorney General informing them of his belief that the only solution to the Iranian oil problem would be some sort of agreement between Iran and Anglo-Iranian. He accompanied this missive with a legal memorandum which stated that under international law Iran appeared to have the right to nationalize the Anglo-Iranian oil properties, but he asserted that the memorandum had not been prepared as a step toward Cities' involving itself in the Iranian situation. Three weeks later the final contract with Gulf for a 15-year supply of 21,000 barrels per day of Kuwait oil, plus an option for an additional 30,000 barrels per day, was signed by Cities and Gulf.

---

[14] At this date Watson was Cities' senior vice president. He subsequently became chairman of the board.

Meanwhile Waldron continued his unsuccessful efforts to sell Iranian oil to various American companies. In particular, in June 1953, he entered into extensive negotiations with the Richfield Oil Company, in which Cities had about a one-third interest. Although great interest was shown initially by Richfield, petitioner was told in September that it had decided not to purchase Iranian oil after all. Then, in 1954 the Consortium was set up to take back Anglo-Iranian's properties and concession from NIOC, and Richfield obtained a share of about 1½% therein.[15]

Petitioner argues that the inference that Cities was a participant in the alleged conspiracy to boycott him follows from the foregoing facts. Even viewed without reference to other facts of record, it is apparent that petitioner's main argument is that Cities' failure to follow through on its original substantial interest in dealing with him is substantial evidence of participation in the boycott allegedly organized by the other defendants. And undoubtedly, given no contrary evidence, a jury question might well be presented as to Cities' motives in not dealing with Waldron, cf. *Poller* v. *Columbia Broadcasting System, Inc.,* 368 U. S. 464 (1962), notwithstanding that such a failure to deal conceivably might also have resulted from a whole variety of non-conspiratorial motives involving the exercise of business judgment as to the attractiveness of the opportunity offered by petitioner. However, as we next show, the record in this case contains an overwhelming amount of such contrary evidence of Cities' motives, much of it supplied by petitioner himself.

---

[15] This percentage was made up of the three equal shares initially awarded to Richfield, Cities, and the Sinclair Oil Corp. (Sinclair also held about a one-third stock interest in Richfield.) Cities and Sinclair both transferred their shares to Richfield, apparently for no consideration.

## B.

Immediately after the nationalization, Anglo-Iranian publicly announced both in the news media and throughout the oil industry its view that the nationalization of its properties and the abrogation of its concession rights amounted to an illegal act under international law and stated its intention to "take all such action as may be necessary to protect its rights in any country," including the bringing of lawsuits against any purchaser of Iranian oil. In addition, the evidence introduced by petitioner tended to show that the other major oil company defendants in this suit, as a result of their fear that countries in which they held concessions would follow the Iranian lead should the nationalization of Anglo-Iranian's property be successful, also communicated to Cities and other domestic oil companies their intention to support Anglo-Iranian by refusing to deal with any company that handled Iranian oil. That such threats were both substantial and effective is demonstrated by the testimony of petitioner that numerous American oil companies, not made parties defendant in this action, refused to deal with him for precisely the reason that they were afraid of retaliation. In addition, petitioner testified that the other defendants had threatened to boycott any companies that leased tankers for use in transporting Iranian oil.

It is thus clear that the evidence furnished by petitioner himself provides a much more compelling explanation for Cities' failure to purchase Iranian oil than does his argument that such failure is evidence of conspiratorial behavior by Cities. When this explanation is placed in juxtaposition with the evidence introduced by Cities showing that the Kuwait deal was arranged long before the nationalization, that Cities objected continually to the formation of the Consortium, and that Cities refused the minimal share offered it as a prospective par-

ticipant therein after the failure of its efforts to block the formation of the Consortium, the suggestion that Cities was in some manner bought off becomes insupportable. Petitioner attempts to escape the force of this showing by arguing that he is obligated not to demonstrate why Cities conspired but only to show that Cities in fact conspired. However, this contention, though undoubtedly true in the abstract, has little relevance to Waldron's theory of how he has introduced evidence that Cities in fact conspired.

Petitioner himself consistently argues that Cities' interests in this entire situation were directly opposed to those of the other defendants. The others had large supplies of foreign oil; Cities did not. The others allegedly were members of an international cartel to control foreign oil; Cities was not. The others were interested in re-establishing the status quo prior to nationalization; Cities was not. It is doubtless due to the difficulty of suggesting a motive for Cities to conspire against him, coupled with Cities' demonstrated interest in his proposals for several months (to the extent that Cities even paid Waldron several thousand dollars to reimburse him for his time and expenses incurred in arranging Jones' trip to Iran), that prompts petitioner, understandably enough, to insist that motive is not controlling in his case. However, to suggest, as petitioner does, that Cities' participation in the conspiracy is shown by its failure to deal with him is itself to rely on motive.

Obviously it would not have been evidence of conspiracy if Cities refused to deal with Waldron because the price at which he proposed to sell oil was in excess of that at which oil could be obtained from others. Therefore, it is only the attractiveness of petitioner's offer that makes failure to take it up suggestive of improper motives. However, it has been demonstrated

above that for Cities to enter into any deal with Waldron for Iranian oil would have involved it in a variety of unpleasant consequences sufficient to deter it from making any such deal.[16] Therefore, not only is the inference that Cities' failure to deal was the product of factors other than conspiracy at least equal to the inference that it was due to conspiracy, thus negating the probative force of the evidence showing such a failure, but the former inference is more probable.

Petitioner does attempt to point to other evidence besides the simple failure to deal as showing conspiracy.[17]

---

[16] In his brief in this Court petitioner drastically changes his theory of conspiracy. He now argues that Cities' participation in the conspiracy was obtained by threats of retaliation from the other defendants. While conceivably petitioner could have argued at the trial level that under such cases as *Klors, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207 (1959), and *United States* v. *Parke, Davis & Co.*, 362 U. S. 29 (1960), acquiescence because of threats in an illegal scheme conceived and carried out by others for their own benefit makes the acquiescing party a member of an illegal combination, we decline to pass upon such a contention when it is presented for the first time in this Court. Although at one point in this complex and protracted case, which has thus far produced over 12,000 pages of record, the petitioner alleged that the other defendants have "secretly threatened, induced and conspired with defendant Cities Service to break off all dealings with plaintiff," this intimation of a coerced acquiescence theory was never properly pursued. *Klors* and *Parke, Davis* have not been cited or discussed by petitioner once in the entire course of these proceedings. One searches in vain among petitioner's papers prior to argument in this Court for a single intelligible statement of this theory. In these circumstances we cannot attribute error to the courts below for their failure to discern such a theory, nor would it be appropriate at this stage in the case for us to pass upon petitioner's theory of combination through coerced acquiescence and the accompanying difficult questions it would raise concerning Cities' liability to petitioner or possible rights over against the other defendants.

[17] Petitioner argues that Cities has thus far failed specifically to deny the allegations in his complaint charging it with conspiracy. In his original complaint petitioner charged that Cities "[a]t this

He places considerable reliance on the report prepared for transmission to Mossadegh in October 1952, immediately after Jones' return from Iran and Watson's announcement to Waldron that Cities was no longer interested in Iranian oil. He stresses two aspects of the report as evidencing Cities' participation in the boycott: first, the statement that it was necessary for Iran to come to some sort of agreement with the British (Anglo-Iranian was owned 51% by the British Government) about compensation for the concession rights and expropriated property, and, second, the suggestion that there existed the possibility that an American company (presumably Cities) would import some Iranian oil purchased

time and by these acts [referring to the Kuwait deal and the Consortium Agreement] . . . entered into combination and conspiracy with the other defendants." Cities submitted an affidavit denying that Kuwait oil and a share in the Consortium had been given it as part of a conspiracy. In other words, Cities denied the factual allegations of petitioner but not the ultimate legal conclusion based thereon, namely conspiracy. A fair reading of that document requires that it be given its intended effect as a denial of petitioner's claim against Cities. Moreover, petitioner never made this argument in either of the lower courts (especially not in the District Court where Cities could have remedied any defects in the papers supporting its motion had they been pointed out in time) and we are not disposed to consider it now, particularly in light of its extreme technicality as applied to the facts of this case.

Petitioner also objects that only W. Alton Jones could have adequately denied the allegations of conspiracy and urges, therefore, that Cities' submission of such an affidavit from Hill rather than from Jones should be held against Cities as evidence of conspiracy. However, as previously pointed out, Hill was the natural person to respond to petitioner's factual allegations about Kuwait and the Consortium. See *supra*, at 271. Contrary to petitioner's characterization of Hill as an attorney and an underling, Hill was an executive vice president of Cities, who had gone to law school many years before but who had not practiced law in a long time. As for petitioner's failure to examine Jones, that has been shown above to be due basically to his own lack of diligence. See also n. 20, *infra*.

directly from NIOC. It is interesting to note that petitioner attempts to use this memorandum in two opposing ways. He suggests, on the one hand, that the reference to the necessity for British cooperation if the Iranian oil industry were to be reactivated is evidence of Cities' adherence to the scheme initiated by Anglo-Iranian to force Iran to return the properties, and, on the other, that the statement that it would be possible for Iran to sell substantial amounts of oil without such an agreement is evidence of Cities' continued interest in Iranian oil. It is difficult to see how the latter contention supports an inference of conspiracy. Petitioner also ignores the fact that the latter alternative was characterized by Jones in the report as less desirable insofar as Iran's long-term interests were concerned, and that, with regard to Cities' participation in such an arrangement, Jones also stated that "[d]evelopment of some method, possibly through agreement between United States and British Governments, [would have to be made] that would allow Iranian crude to move to U. S. markets without tie-ups, law suits and other similar harassments to the purchasers of the crude."

Petitioner also emphasizes the statement sent by Jones to the incoming Secretary of State and Attorney General that the only solution for Iran lay in some sort of accommodation with the British. Since this was also the position taken, in effect, by the other alleged conspirators, petitioner suggests that it too shows common purpose. However, once Jones had decided that Cities could not risk trying to break the boycott itself, it was merely a factual observation to state that Iran would not be able to restore the operation of its oil industry without some kind of agreement being made with the boycotters. The use of the phraseology that this was the only "honorable course" hardly changes the factual background of the letter.

In addition, the statement is substantially similar to that made in the report intended to be sent to Premier Mossadegh on which petitioner relies to show Cities' continued interest in Iranian oil. Petitioner himself notes that the agreement contemplated in the report between Iran and Anglo-Iranian would involve an American company (hopefully Cities) taking over the operation of the oil industry, while Anglo-Iranian would be compensated for its property. Since Anglo-Iranian was insisting that its property and concession rights be returned to it outright, and was rejecting proposals to substitute the payment of compensation therefor, this proposal by Jones is not reasonably susceptible of the interpretation sought to be placed on it by petitioner.

Moreover, the letter was accompanied by a legal memorandum, stating that Iran had a right under international law to nationalize its oil industry, that ran directly counter to the consistent position taken by the other defendants in this case. Indeed, it went to the heart of their defense, since one of the arguments being made below is that the other defendants were merely acting to protect their property rights. See 231 F. Supp., at 87.

Petitioner argues that the failure of the Richfield Oil Co. to deal with him is evidence of conspiracy by Cities because Cities was a major, although not a controlling, stockholder in Richfield. However, aside from Cities' stock interest in Richfield, petitioner has produced no evidence other than speculation to connect this failure with any action by Cities. As for the probative value of the failure to deal with Waldron, the same objection is applicable to the proposed transaction with Richfield that has been discussed in connection with the proposed deal with Cities, namely, the probability that it was due to a desire to avoid difficulties that would be presented by Anglo-Iranian and the other defendants. Moreover, since petitioner's contract had expired by the

time the deal fell through, it is also possible that no agreement was reached because Waldron no longer had anything to offer. Therefore, the failure of petitioner to sell oil to Richfield adds nothing to his case against Cities.

Finally, petitioner places great reliance on Jones' alleged interference in his efforts to sell the United States Government a cargo of gasoline for military use. One difficulty with this contention is that the incident occurred at a time when, petitioner conceded in the trial court, Cities was not yet a member of the conspiracy. A more basic objection to it, however, is that it is apparent that Jones, in his cable to the Secretary of the Interior, was primarily concerned with disassociating himself from Carter's efforts to promote the sale, efforts which Carter intended to tell the Secretary were supported by Jones. Under those circumstances, what petitioner characterizes as vindictive interference by Jones appears far more likely to have been a desire not to be used in someone else's financial dealings. In any event, it is insufficient support, in light of all the other evidence, on which to base a case for participation by Cities in the conspiracy.

## C.

In support of his contention that summary judgment against him was improper, petitioner relies heavily upon *Poller* v. *Columbia Broadcasting System, Inc.*, 368 U. S. 464 (1962). In *Poller* the plaintiff claimed that CBS canceled its affiliation agreement with his UHF station pursuant to a conspiracy between CBS and some third parties to drive him out of business in order to give CBS a short-term monopoly of the UHF market in the Milwaukee area, and ultimately to eliminate UHF competition there entirely. The plaintiff introduced evidence showing that CBS had canceled his affiliation, that it purchased and affiliated with another UHF station in

competition with him, that he was driven out of business as a result of the competition with the other station, and that subsequently CBS terminated the operation of its station, thereby leaving the Milwaukee market without any UHF service at all. CBS in turn relied on evidence consisting largely of affidavits from, and depositions of, various of its executives asserting that the actions taken by it were the result not of conspiracy but of its legitimate business decision to enter into competition in the UHF market in the Milwaukee area. The basic issue between the parties, therefore, concerned the motives of CBS in canceling its affiliation with the plaintiff Poller. This Court held that where there was substantial factual evidence tending to show the existence of a conspiracy to eliminate a competitor and where the crucial question was motive, summary judgment was prematurely granted against the plaintiff, notwithstanding the fact that there was also substantial evidence tending to show the nonexistence of conspiratorial behavior.

At first glance the present case seems to present substantial similarities to the situation in *Poller* in that the issue as to Cities' motive in failing to conclude a deal with petitioner is likewise basic to the litigation here. However, there are crucial differences between the two cases. In *Poller* the competitive relationship between CBS and the plaintiff was such that it was plausible for the plaintiff to argue that CBS had embarked on a plan to drive him out of business. In this case, as Waldron has admitted right along, the business relationship between him, Cities, and the other defendants was such that it is much more plausible to believe that Cities' interests coincided, rather than conflicted, with those of petitioner. And, in fact, the course of dealings between petitioner and Cities over the strenuous objection of the other defendants gives ample evidence of

precisely this similarity of interest. As Waldron himself candidly stated in the course of his deposition, he would not have originally included Cities as a coconspirator had he not conceived the idea that the ultimate failure of Cities to deal with him was the result of some sort of payoff. Yet as described, *supra,* at 263–264, 267, Cities has introduced overwhelming evidence that no such payoff was ever made or promised to it in return for an agreement not to deal with Waldron, a showing which petitioner has in no way rebutted. Petitioner is thus forced to take the position that the one fact that he has produced, Cities' failure to make a deal with him for Iranian oil, is sufficiently probative of conspiracy to entitle him to resist summary judgment.

In support of this position, petitioner relies heavily on *Interstate Circuit, Inc.* v. *United States,* 306 U. S. 208 (1939), and *Theatre Enterprises, Inc.* v. *Paramount Film Distributing Corp.,* 346 U. S. 537 (1954). In *Interstate Circuit* a group of motion picture distributors, at the request of two large first-run exhibitors, simultaneously imposed identical restrictions on subsequent showings of the films they distributed. These restrictions had the effect of forcing subsequent-run exhibitors to raise their admission prices substantially in the direction of the prices then charged by the competing first-run exhibitors at whose behest the restrictions were imposed. This in turn tended to restrain competition among the exhibitors by depriving the subsequent-run exhibitors of much of their ability to compensate for their competitive disadvantages by selling tickets at a considerably lower price than that charged by the first-run exhibitors. Other restrictions prohibiting the showing of double-features in subsequent-run theatres were imposed with similar anticompetitive effects. There was no direct evidence showing that the distributors agreed with one another to impose the identical restrictions, but it was

shown that each distributor knew that all the other distributors had been approached with the same proposal and that the imposition of the restrictions would be feasible only if adhered to by all distributors. Finally, it was shown that the identical action taken had the effect of creating a likelihood of increased profits for each distributor. This Court held that on the foregoing facts a tacit agreement to restrain competition between the distributors could properly be inferred.

*Interstate Circuit* differs from the case at hand in precisely the same way that *Poller* does, namely, in the inferences of motive that can reasonably be drawn from the facts. The reason that the absence of direct evidence of agreement in *Interstate Circuit* was not fatal is that the distributors all had the same motive to enter into a tacit agreement. Adherence to such an agreement would enable them to increase their royalties by forcing a rise in admission prices without the danger of competitors enlarging their share of the subsequent-run market by refusing to impose similar restrictions. That such a step would also aid the first-run exhibitors proposing it to restrain competition between themselves and subsequent-run exhibitors would not significantly diminish the anticompetitive benefits to be obtained by the distributors. Here Waldron is unable to point to any benefits to be obtained by Cities from refusing to deal with him and, therefore, the inference of conspiracy sought to be drawn from Cities' "parallel refusal to deal" [18] does not logically follow.

*Theatre Enterprises,* also relied on by petitioner, merely reiterated the holding of *Interstate Circuit* that "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," 346

[18] See generally Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals To Deal, 75 Harv. L. Rev. 655 (1962).

U. S., at 540, in the course of ruling that the parallel behavior there shown did raise a conspiracy issue for the jury, which permissibly resolved it in the defendants' favor on the basis of the other contrary evidence in the case. It did not purport to deal with a situation where the interests of the parties whose behavior was "consciously parallel" were substantially divergent and thus is inapplicable here. Thus neither precedent nor logic supports petitioner's contention that the evidence to which he points is significantly probative of conspiracy and, therefore, we hold that on the facts as shown summary judgment was correctly awarded to respondent.

## IV.

Rule 56 (e) of the Federal Rules of Civil Procedure states that "[w]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of his pleading, but his response . . . must set forth specific facts showing that there is a genuine issue for trial." Petitioner contends that the lower courts misapplied Rule 56 (e) in this case and erroneously placed the burden on him to show that there was a material issue of fact for trial, rather than first requiring respondent Cities Service, the movant, to demonstrate the absence of a "genuine issue as to any material fact" under Rule 56 (c). However, it should be noted that the decisions below did not purport to discuss burden of proof at all. Therefore petitioner must demonstrate that, regardless of what was specifically held, the effect of the decisions below was to so shift the burden of proof.

It is true that the issue of material fact required by Rule 56 (c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that

is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. The case at hand presents peculiar difficulties because the issue of fact crucial to petitioner's case is also an issue of law, namely the existence of a conspiracy. What Rule 56 (e) does make clear is that a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him.[19] Yet the analysis of the facts undertaken above demonstrates that, due to the absence of probative force of Cities' failure to deal with Waldron as being in itself evidence of conspiracy, petitioner's position is, in effect, that he is entitled to rest on the allegations of conspiracy contained in his pleadings. Thus petitioner repeatedly states that Cities has never disproved its participation in the alleged conspiracy, despite the fact that the only evidence of such participation is his allegation that the failure to deal resulted from conspiracy.

Essentially all that the lower courts held in this case was that Rule 56 (e) placed upon Waldron the burden of producing evidence of the conspiracy he alleged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegation were not susceptible of the interpretation which he sought to give them. That holding was correct. To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56 (e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to

---

[19] Indeed it was for the precise purpose of overturning a line of cases in the Third Circuit holding that a party could successfully oppose summary judgment by relying on his well-pleaded allegations that Rule 56 (e) was amended in 1963. See 6 Moore, Federal Practice ¶ 56.22[2], at 2821 (2d ed. 1966).

a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

## V.

We have postponed our discussion of petitioner's contention that he should have been permitted additional discovery prior to the grant of summary judgment to this point in order that it may be evaluated in the light of what he had succeeded in accomplishing as of the date he made the motion.

## A.

Petitioner makes much of the fact that the present action has been pending in the lower courts for 11 years and that he has not yet received a formal answer to his complaint from any defendant nor been permitted any general discovery. Petitioner also complains of the inequity of his being faced with a motion for summary judgment after having been deposed for thousands of pages by the defendants, but before he has had an opportunity to obtain discovery from them. In particular, he emphasizes that in an antitrust conspiracy case discovery is vital because most of the evidence of conspiracy will naturally be in the hands of the defendants. However, petitioner fails to come to grips with the problems presented in this extremely complicated suit by the fact that one of the defendants, Cities Service, has from the beginning of the litigation attempted to disassociate itself

from the others on the ground that, as petitioner himself acknowledged and initially alleged, it was in a totally different position from the other defendants.

Thus when petitioner emphasizes the considerable discovery had of him by the defendants as a group, he implies that Cities has been unfairly permitted more discovery of him than he has of it. He attempts to minimize the significance of the fact that Cities' participation in his examination amounted to a total of 3½ days of deposition testimony by arguing that Cities benefited from the extensive examination conducted by the other defendants. The record reveals, however, that much of the evidence obtained by the other defendants in deposing petitioner and his associates is relied on heavily by petitioner himself to bolster his case against Cities. Had the record in this case consisted only of the evidence obtained by petitioner from Cities together with the testimony taken by Cities from Waldron, petitioner's case against Cities would be even weaker than it is. In fact, petitioner would undoubtedly have chosen to submit affidavits in opposition to Cities' motion for summary judgment containing much of the same material incorporated in his and his associates' depositions. Hence petitioner benefited as much *vis-à-vis* Cities from the depositions taken by the other defendants as Cities did. Under such circumstances petitioner cannot justifiably claim that Cities has been given an unfair advantage by the extent of his examination by the other defendants.

As for petitioner's general objections to the length of time that his case has been pending, it is clear that Cities Service has been the only party to the litigation that has exhibited any consistent desire to expedite the proceedings, and that, even where postponements and adjournments have been sought by either Cities or the other

defendants, petitioner has always been willing to acquiesce in delay.[20] Certainly petitioner cannot claim that it was the responsibility of the trial judge to hurry matters along by rejecting stipulations entered into by all the parties to the case.

Petitioner's more vehement objections have to do with his claim that he has been stayed from obtaining general discovery of the other defendants in the case throughout the period during which he has sought to build a case against Cities. Since there is no indication that petitioner will be unable to obtain general discovery at some future date of the other defendants for use against them in the case still pending below, the issue here is whether he can compel Cities to remain a party to the litigation pending such general discovery. Assuming the correctness of petitioner's claim that he has been stayed from conducting such discovery (a claim disputed not altogether unpersuasively by respondent), the fact remains that petitioner has had discovery of the one party he is presently opposing and, therefore, his right to additional discovery must depend on the strength of his argument that it is necessary to his case against that party.

---

[20] It must be remembered that the fact that approximately six years had elapsed between the date petitioner filed his complaint and the completion of the examination of petitioner and his associates is in no way the responsibility of the trial judge. Both parties had, as previously described, entered into numerous stipulations postponing the taking of depositions for months at a time. Petitioner argues that he cannot be penalized for not working full time at supplying the defendants with deposition testimony. This is certainly correct. However, petitioner cannot, by the same token, attempt to penalize respondent for delays in which he acquiesced with no hint of objection. Certainly no one will contend that over $5\frac{1}{2}$ years represents an example of the speed that a party interested in securing a swift resolution of his claims will require in order for himself and his associates to give 153 days of testimony.

While petitioner now asserts that he has been vigorously demanding discovery of the other defendants right along, the record reveals that back in 1960, on one of the occasions at which petitioner claims to have requested such discovery, his counsel stated, "I think the obvious place to begin is with Cities Service . . . and whether we need to go farther than that I don't know, and it would depend very much on what turned up there . . . ." It was only after two examinations of Cities Service personnel that petitioner finally made a formal motion for discovery of the other defendants in anticipation of Cities' renewal of its motion for summary judgment. In support of this motion petitioner was able to point to no significant evidence that he had turned up to show any dealings between Cities and the other defendants, other than the largely abandoned Kuwait oil transaction. His basic argument was, and is, simply the general proposition that in a conspiracy case the evidence is usually in the hands of the conspirators and that, therefore, he should have been permitted to examine the other alleged conspirators to see if he could obtain anything from them that would tend to link Cities to them.

It is probably true that in the ordinary conspiracy case a plaintiff would be entitled to obtain discovery against all the alleged conspirators instead of being obligated to proceed against them *seriatim*. However, in this case, by the plaintiff's own doing, one of the alleged conspirators was singled out from the rest as having joined the conspiracy at a much later date as the result of specific inducements. Being placed by petitioner's complaint in the position of being what might be termed a tangential defendant, Cities legitimately attempted to extricate itself from an expensive and protracted lawsuit. We do not mean to imply that a plaintiff should be

barred from changing the theory of his case in response to information he obtains in the course of discovery. But when the evidence so obtained shows both that the defendant is in fact tangential and that the allegations by which he was linked to the other defendants are factually incorrect, we think that a burden should indeed be placed on the party changing his theory to show a significant likelihood that discovery of the other defendants would produce evidence different from that obtained thus far. In this case petitioner has only speculation as to what discovery of the other defendants would reveal about their relations with Cities Service, and not very persuasive speculation at that, since all the evidence thus far produced by any party on this subject supports the hypothesis that Cities was opposed to the other defendants rather than in collusion with them. Accordingly, it was not error on the part of Judge Herlands on these facts to deny that portion of petitioner's motion in opposition to summary judgment that requested general discovery of all the other defendants in this case.

## B.

Petitioner acknowledges the fact that he has had some discovery of Cities Service pursuant to court order. However, he contends vigorously that the discovery he has obtained has been too limited to enable him adequately to resist the motion for summary judgment. Petitioner points out that he was initially limited to taking the deposition of Hill instead of Jones, notwithstanding the fact that Jones was the person at Cities with whom he primarily dealt with regard to the Iranian oil situation. He claims prejudice from the fact that Jones died before he could be deposed in that those Cities' personnel whom he eventually deposed, namely, Watson, Frame, and Heston, were not an adequate substitute for

Jones. He also argues that he should have been allowed to depose Carter. Finally, petitioner asserts that his examination of the three executives was improperly limited in scope by Judge Herlands and that he should have been permitted general access to Cities' files for all documents in connection with Cities' activities in Iranian oil between the time he first approached Cities and 1955 in order to compensate for his inability to examine Jones.

It has already been observed [21] that the absence of testimony from Jones in this litigation is largely happenstance, since there is absolutely no indication that Judge Herlands would not have permitted him to be deposed when Watson, Frame, and Heston were examined had he been available. In addition, while it is doubtless true that Jones, as president of Cities, could have testified more authoritatively with regard to certain of the questions concerning Cities' dealings in Iranian oil, petitioner's consistent attempt to portray those Cities executives who were deposed as uninformed underlings is substantially overstated. Notwithstanding some areas of ignorance, Watson, Frame, and Heston were privy to a considerable amount of information in connection with Cities' dealings both with Iran and with the other defendants. While Jones may have been the dominant figure in the Cities operation, it is simply unrealistic for petitioner to suggest that Jones could have involved Cities in a conspiracy on the scale which is alleged to have existed here without any knowledge on the part of the other major executives of the company.

Petitioner's desire to depose Carter, which appeared for the first time in the litigation at this late date, is interesting in light of the fact that originally Carter had been listed as one of petitioner's associates and the defendants had formally noticed their intention to depose

[21] See *supra*, at 272.

him in that capacity. Petitioner does not adequately explain why, if such were in fact the case, he required a court order to examine Carter, who was not an employee of Cities. It should be emphasized in this connection that so far as appears from the record petitioner has introduced absolutely no evidence on his own behalf in this case except the deposition testimony obtained from himself and his associates by the defendants and the testimony and documents obtained from Cities pursuant to Judge Herlands' various discovery orders.

Petitioner's counsel stated in his affidavit attached to the discovery motion that Carter became an adherent of Cities immediately after petitioner filed his complaint and implied that Carter would not voluntarily testify. Assuming that to be true, although such an assumption seems open to question in view of the absence of any specific allegation to that effect, [22] no explanation is proffered as to why petitioner did not try to obtain discovery of Carter earlier if his testimony were thought necessary to petitioner's case. Petitioner was aware long before late 1964 that Cities was contending that it was not a member of any conspiracy that may have existed between the other defendants, and that it resisted being put to the expense of participating in what showed every sign of being an extremely protracted litigation. Given the fact that Judge Herlands had stated, in declining to grant Cities' original motion for summary judgment back in 1961, that he regarded petitioner's case against Cities as extremely weak, it seems quite proper to infer from the timing of petitioner's initial request to depose Carter that he did not regard Carter as someone whose

---

[22] In fact, the affidavit submitted by petitioner's counsel in support of his discovery motion is replete with references to the ill-use Carter allegedly suffered at the hands of Cities—rather an unpersuasive argument in support of the suggestion that in some way Cities had prevented Waldron from obtaining access to Carter.

testimony was significantly likely to help him resist a motion for summary judgment. On the contrary, the timing of the initial request suggests strongly that petitioner was more interested in establishing grounds on which to contend that Cities' motion for summary judgment should not yet be granted than he was in actually discovering what evidence Carter was in a position to furnish to him. There is no real indication, despite his arguments to the contrary, that petitioner obtained information in the course of his prior discovery that made Carter a more vital witness in 1964 than he would have been in 1961 or 1963.

As for petitioner's documentary requests, and his complaints about improper limitation of his previous discovery presented in support thereof, it is apparent that the time period to which they relate is in large part a period during which petitioner was no longer having any dealings with Cities. This is important because of two factors crucial to Waldron's conspiracy charge against respondent: first, petitioner argues that Cities joined the conspiracy when it refused to go through with a deal through him for Iranian oil, namely, in the latter part of 1952, and second, petitioner's contract with NIOC, the property right allegedly interfered with by the illegal boycott, expired in the spring of 1953. In addition, petitioner had at the time of this motion already obtained discovery of a very substantial number of documents having to do with Cities' dealings in Iranian oil prior to November 1, 1952, the latest point in time ever seriously suggested by petitioner for Cities to have joined the conspiracy.

In a proper case, of course, a party might well have the right to demand discovery of documents from an opposing party dealing with activities during a period outside that covered by the subject matter of the lawsuit

in order to provide some indication of the ramifications of the actions forming the basis of the complaint. We do not doubt that, had petitioner introduced some significant evidence that Cities had become a member of the conspiracy alleged in his complaint, more extended discovery under Rule 56 (f) of Cities' activities subsequent to its refusal to deal with him would have been proper. Likewise, given sufficient evidence of conspiracy, broader access to Cities' files for the period within which petitioner had already had discovery would have been in order. But in this case petitioner was attempting, in effect, to obtain discovery of peripheral aspects of Cities' alleged participation in the conspiracy, after having failed, despite already substantial discovery, to obtain any significant evidence of conspiracy for the period during which it was alleged to have directly injured him. It is precisely because the discovery obtainable under Rule 56 (f) [23] to oppose a motion for summary judgment would normally be less extensive in scope than the general discovery obtainable under Rule 26, that such a manner of proceeding was properly refused here.

Notwithstanding Waldron's complaints about the limitations placed on his discovery of materials and witnesses, it is evident that he has had sufficient discovery either to substantiate his claims of conspiracy to the extent of raising a material issue of fact thereon, or of providing a basis for investigation of his own to gather additional evidence during the five years for which Cities' motion was pending below. The fact that petitioner accomplished neither of these ends with the discovery he obtained is ample support for the trial judge's determination that additional discovery would be futile and would merely operate to require Cities to participate

[23] Petitioner conceded below that his discovery should proceed under Rule 56 (f) rather than Rule 26.

further in litigation in which it had been originally joined solely on the basis of conjecture.

For the foregoing reasons we hold that summary judgment was properly awarded in the courts below to respondent.                              *Affirmed.*

MR. JUSTICE DOUGLAS took no part in the decision of this case.

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE BRENNAN join, dissenting.

The Court here upholds a summary judgment against a plaintiff in a suit for treble damages under the Sherman Antitrust Act. The case is a complex one in which the summary judgment was entered 11 years after the action was brought. It is strange, indeed, that during the more than 11 years before the summary judgment was entered, the defendant Cities Service should have enjoyed the luxury of never having been compelled by the court to answer the complaint, never having been required either to admit or deny the plaintiff's charges that the defendant had entered into a conspiracy to destroy plaintiff's business by boycotting it. There is one thing still stranger and more fantastic about the case; although the court permitted the defendants to interrogate the plaintiff for 153 days over a period of $5\frac{1}{2}$ years, the same court refused during the 11 years to permit the plaintiff to ask any questions whatever of many of Cities' officers and employees who were most familiar with transactions about which the plaintiff complained. And all this was done in the face of our holding in *Poller* v. *Columbia Broadcasting System, Inc.*, 368 U. S. 464, 473 (1962), that "summary procedures should be used sparingly in complex antitrust litigation" and that "[t]rial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.' "

The following statement of the way this summary judgment was entered is sufficient, I think, to show the gross error of the Court's affirmance of the judgment.

In 1956 petitioner Waldron [1] brought suit against the Standard Oil Company (New Jersey) and six other major oil companies including Cities Service Co., the respondent here. The complaint alleged a general conspiracy beginning in 1928 on the part of all the defendants but Cities. It was alleged that Cities joined the conspiracy after the Government of Iran nationalized the properties of the Anglo-Iranian Oil Company in May 1951, and that the defendants conspired together to prevent petitioner Waldron from selling any of the Iranian oil. To carry out the boycott the alleged conspirators threatened all other companies with dire economic consequences if they dealt in the Iranian oil. Despite these threats, Cities, which did not control sources of oil adequate to supply its customers and which therefore had been compelled to buy from the major companies, expressed to petitioner a desire to obtain Iranian oil. Petitioner was offering to sell the Iranian oil on very attractive terms, and Cities agreed to go to Iran in order to evaluate the prospects, provided it received an invitation from Iranian Premier Mossadegh. Petitioner thereupon went to Iran, secured a written invitation from the Premier, and in due course the President of Cities Service, W. Alton Jones, went to Iran, taking with him other high Cities officials who, as experts, could help him appraise the possibilities of operating the old Iranian plants. Petitioner Waldron also went along. The investigation in Iran was made, but during the trip, Jones made a secret side-trip to Kuwait to pursue negotiations for buying oil from Gulf

---

[1] The original plaintiff Waldron, like several crucial witnesses in this case, is dead and this action is now being carried on by his executor. For the sake of clarity I will refer to the original plaintiff Waldron as the petitioner here.

Oil, one of the alleged conspirators. Jones' associates did not accompany him on this trip to Kuwait, and Cities made every effort to conceal the secret visit from petitioner. In fact, as late as 1960, during the course of this lawsuit, Cities continued to deny that Jones had ever gone to Kuwait while on the Iranian trip; the fact was not finally revealed until 1964 when petitioner was at last permitted to question some of the Cities officials who had been involved in the Iranian trip.

After the trip to Iran, Cities officials prepared a memorandum reporting favorably on the prospects for using Iranian oil, but then in October 1952 Cities abruptly informed Waldron that it had no further interest in the Iranian oil which petitioner was offering on such favorable terms. The intense pressure to which Cities was being subjected at this time by the major companies is suggested by an incident that occurred only a month later at the annual convention of the American Petroleum Institute. Jones, President of Cities, had been slated to receive the Institute's gold medal for being selected oil man of the year, but at the meetings representatives of the major companies threatened Jones that they would cut off Cities' supplies of its sorely needed crude oil if he dealt further in Iranian oil, and he was not presented with the gold medal. Three months later the agreement between Cities and Gulf for the purchase of the Kuwait oil was formally executed. Then, after petitioner's efforts to sell the Iranian oil had completely failed, the Iranian Government was forced to agree to turn over the nationalized properties to a Consortium of the major oil companies, and Cities was granted a small share in the Consortium.

Petitioner's antitrust complaint charged that Cities, which previously had eagerly pursued the prospect of purchasing Iranian oil, had changed its views and had forgone its chance to make the "billions" that Jones had

foreseen, in order to get the Kuwait oil and membership
in the Consortium. After the complaint was filed, Cities
examined petitioner at length, at the same time getting
the court to postpone its time for answering the com-
plaint until after these examinations could be completed.
Then Cities filed affidavits charging that petitioner's
allegations about the Kuwait and Consortium deals had
no basis in fact and moved for summary judgment. The
court deferred ruling on the summary judgment motion
but at the same time refused to permit petitioner to
obtain general discovery to enable him to prove his case
against Cities; instead the court authorized a limited
discovery relating only to the Kuwait purchase and the
Consortium arrangement; petitioner's inquiry was also
sharply limited both as to the subject matter and the
time period of any transactions that could be questioned.
At the same time the court refused to permit petitioner
to take the deposition of Jones and those of his associates
who had the greatest opportunity to know the reasons for
the drastic change in Cities' attitude on buying Iranian
oil. The Court instead ordered that only George H. Hill,
a Cities vice president who had never met petitioner or
known anything about the Iranian oil deal but who
had been in charge of negotiating the Kuwait deal and
who had led Cities' attempts to obtain a share in the
Consortium, would be required to answer petitioner's
questions.

After taking the deposition of Hill, petitioner filed an
amended complaint which eliminated his specific reliance
on the Kuwait and Consortium deals and stressed gen-
erally that Cities' participation in the conspiracy had
been obtained by threats and inducements from the prin-
cipal conspirators. The court again postponed a ruling
on Cities' motion for summary judgment, and ordered
that petitioner be permitted to make some further dis-
covery, but once again the scope of discovery permitted

to petitioner was sharply limited. In addition, Cities' president, Jones, had died during the period when petitioner was restricted by the court's order to taking only the deposition of Hill, and thus petitioner was never able to question the one man who was the crucial figure in the alleged Iranian transactions. Of the seven other Cities officials who had been involved in these transactions, three had also died during the long period in which the court had stayed petitioner from taking their depositions.

In spite of the fact that petitioner had amassed considerable evidence of Cities' liability, in spite of the fact that Cities had been given unrestricted freedom to question petitioner while petitioner was barred from getting any information at all from Cities employees familiar with the Iranian transactions, in spite of the fact that the discovery eventually allowed to petitioner had been sharply restricted, in spite of the fact that petitioner never had an opportunity to question four of the eight Cities officials who had been most intimately connected with the alleged transactions, and in spite of the fact that Cities had never been required to answer the allegations of the complaint, the court entered summary judgment for Cities in September 1965. 38 F. R. D. 170 (1965). The Court of Appeals, in a short, uninformative opinion, affirmed the decision of the District Court. 361 F. 2d 671 (C. A. 2d Cir., 1966).

I.

The Court's action in affirming this judgment cannot possibly be reconciled with this Court's holding in *Poller* v. *Columbia Broadcasting System, supra.* There the Court warned against using summary judgments to decide complex antitrust litigation where motive and intent play leading roles. This is just such a case. Its complexity is such that even with a summary judgment it took 11 years to end it. Literally months and years were spent

in examining plaintiff, in getting affidavits and holding numerous hearings. It is little less than farcical to treat a case that eats up that much time as one suitable for a summary judgment. It certainly would not have taken one-tenth of that much time to give the case a full-dress trial, where sworn testimony before a jury rather than affidavits presented to a judge could have been used to adjudicate plaintiff's rights in accordance with due process of law. An excuse for summary judgments has always been that they save time. If the time has come when the best speed record they can make is to take 11 years to decide one of them, the idea of summary judgments as time-savers is a snare and delusion and the best service that could be rendered in this field would be to abolish summary judgment procedures, root and branch. The plain fact is that this case illustrates that the summary judgment technique tempts judges to take over the jury trial of cases, thus depriving parties of their constitutional right to trial by jury.

It seems clear to me that even with petitioner's very limited opportunity to gather evidence in support of his case, there is ample evidence in this record from which a jury could conclude that respondent Cities did indeed join the alleged conspiracy. Petitioner established that Cities needed Middle East oil, that he was offering Iranian oil on very attractive terms, and that Cities had in a number of ways manifested its considerable interest in purchasing this oil. Suddenly, Cities announced to petitioner that it did not intend to pursue the deal any further, and in fact took steps to make more difficult petitioner's efforts to sell the oil to others.[2] This refusal

---

[2] Thus, Cities' President, Jones, instructed an associate to cable the Secretary of the Interior to advise the United States Government against purchasing gasoline from petitioner for military use. Although in the Court's view this cable was "primarily" designed to

to deal could of course be explained by a number of motivations, but petitioner contends that this record raises the significant possibility that Cities action was predominantly motivated not by legitimate business considerations but rather by a decision to join the alleged conspiracy, induced either by threats of the conspirators or by a payoff in the form of the Kuwait and Consortium deals. The Court rejects each of these theories, although for sharply contrasting reasons, and concludes that despite the possible illegitimate motivations, evidence now in the record suggests that other motivations were, in the Court's opinion, more probable. As I have already indicated, I could never accept this as the appropriate standard, under *Poller, supra,* for determining whether a defendant in a case such as this is entitled to summary judgment.

## II.

The Court in this case has deprived plaintiff of his right to discovery on highly technical and wholly indefensible grounds. The heart of the complaint here was that Cities Service and others conspired to boycott plaintiff's sale of Iranian oil by use of threats and monopoly power in violation of the antitrust acts. Rule 56 (e) comprehensively provides for the use of depositions and affidavits, and Rule 56 (f) provides that where it appears that affidavits are unavailable the Court may refuse the application for summary judgment, or may order a continuance to permit affidavits to be obtained, or make such other order as is just. Thus it appears that the

---

disassociate Jones from petitioner's efforts to promote the sale, *ante,* at 284, this is certainly a rather narrow view of a cable that explicitly states, "I seriously question wisdom of such action." In any event I cannot understand how this Court can justify taking from the jury the responsibility for judging the primary purpose and effect of a piece of evidence such as this.

rules contemplate that a party may not be shut off from an opportunity to get affidavits to give him his day in court. No judge is granted power under Rule 56 or any other rule to completely deny a party all opportunity to take depositions or to get affidavits essentially needed to get a fair trial of his case. Such a course of conduct cannot possibly be called "just" within the meaning of Rule 56 (f), and yet here this plaintiff, over a course of years, repeatedly pleaded with the district judge for an opportunity to examine Jones and other Cities Service employees particularly familiar with the Iranian oil deal in order to present facts he had no other way to obtain. Of course, a party who is suing a company and who is dependent for proof on company employees must have the force of the law behind him or he cannot get testimony from such employees against their company. That the rule makers did not intend any such burdens to be imposed upon discovery is also shown by Rule 27, which even authorizes depositions to be taken, before any suit is filed, by any person who fears or expects that he may be a party to an action.

The excuse given by the trial court for cutting off plaintiff's right to discovery here will not hold water. It was that by pleading at one time that there were two possible reasons for Cities joining the conspiracy to boycott, he was perforce eternally barred from examining the defendants about any reasons other than those two in order to get more complete information as to why they conspired. To uphold this view of the District Court is to treat a lawsuit as a game in which the party who gets there first with the most questions wins the game. But lawsuits are not games. The end of each one of them, if courts remain true to the ancient traditions of justice, is to try each case in a way that permits truth to triumph. That has not been done here. This

petitioner was and is yet entitled to examine the Cities Service employees still living who know about this case. Law and justice require it. Too much time has already been wasted in an effort to provide a summary disposition of a case that should not be disposed of that way.

I would reverse the case and direct that it go to trial.