The **DAILY PRESS, INC.**, Plaintiff-Appellant,

v.

**UNITED PRESS INTERNATIONAL**, The Evening News Association, Knight Newspapers, Inc., Defendants-Appellees.

No. 18723.

United States Court of Appeals
Sixth Circuit.

June 20, 1969.

---

10. Morgan made other contributions on a similar basis in later years.

Eugene Driker, Detroit, Mich., for appellant; Erwin Ziegelman, Detroit, Mich., on brief; Barris, Sott, Denn & Driker, Parsons, Tennent, Hammond, Hardig & Ziegelman, Detroit, Mich., of counsel.

H. William Butler, Leslie W. Fleming, Kenneth Murray, Detroit, Mich., for appellees; Peter A. Davis, Clark, Klein, Winter, Parsons & Prewitt, Detroit, Mich., on brief for United Press International; Baker, Hostetler & Patterson, Cleveland, Ohio, of counsel; Rockwell T. Gust, Detroit, Mich., on brief for The Evening News Assn.; Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., of counsel; Brownson Murray, Detroit, Mich., on brief for Knight Newspapers, Inc.

Before WEICK, Chief Judge, and O'SULLIVAN and McCREE, Circuit Judges.

WEICK, Chief Judge.

The controversy in this anti-trust case arose out of a strike which closed down Detroit's two major daily newspapers for about four months. One week after the strike started, plaintiff, The Daily Press, Inc. [Daily Press], was incorporated under the laws of Michigan to publish an interim newspaper in Detroit for the duration of the strike. Publication was commenced on July 22, 1964, and ceased on November 22, 1964, when the strike ended.[1] Two days before publication was ceased, Daily Press filed the present suit in the District Court against the struck newspapers, The Evening News Association, publisher of the Detroit News [News], Knight Newspapers, Inc., publisher of the Detroit Free Press [Free Press], and United Press International [UPI], a corporation engaged in worldwide gathering of news and selling of same to newspapers and other media.

In its complaint, plaintiff's claim was blown up out of all proportion. Stripped of verbiage, the nub of the claim was that UPI refused to furnish plaintiff with its wire services during the strike, and that the News and Free Press had induced UPI to take such action, all as part of a conspiracy on the part of the defendants to restrain competition and to monopolize news services, newspapers and newspaper advertising, in violation of Sections 1 and 2 of the Sherman Act[2], for which plaintiff sought to recover damages of $2,500,000, trebled to $7,500,000 under Section 4 of the Clayton Act.[3]

The defendants answered separately, denying that they participated in a conspiracy and denying that they restrained competition or attempted a monopoly. Extensive discovery ensued, in which officers and employees of all of the parties were deposed, affidavits were filed, and many documents and papers were produced.

---

1. Daily Press was a very successful venture. Its editorial and advertising staffs were made up largely of employees of the Free Press, and circulation was handled by idled employees of the News. They all intended to and did return to their jobs when the strike was over. Daily Press earned over $1.8 million in advertising revenue, and $1.1 million in circulation revenue, in the short period (four months) of its operations. Salaries of $90,000 were paid to its three officers, who along with other shareholders withdrew $414,650 of plaintiff's net income, leaving $51,109.-32 in retained net income. It claims it was damaged in the amount of $2,500,000 because it had not been furnished the UPI wire service.

2. 15 U.S.C. §§ 1 and 2.

3. 15 U.S.C. § 15.

128

The defendants then filed separate motions for summary judgment, which the District Judge considered upon depositions, affidavits, and exhibits.

The District Judge, in an opinion appearing in twenty-five pages of the record, determined that there was no genuine issue as to any material fact; and that the charges in the complaint were unsupported by the evidence and were wholly unfounded. He granted the motions for summary judgment and dismissed the complaint. On appeal the principal point urged upon us by appellant is that the District Court ought not to have disposed of the case on summary judgment.

The Supreme Court in Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), held that summary judgment should be used sparingly in complex antitrust litigation. It enunciated the following rule:

"Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case 'show that [except as to the amount of damages] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law'. Rule 56(c), Fed.Rules Civ.Proc. 28 U. S.C.A. This rule authorizes summary judgment 'only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, * * * [and where] no genuine issue remains for trial * * * [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.'" Id. at 467, 82 S.Ct. at 488.

We followed Poller in Southern Blowpipe & Roofing Co. v. Chattanooga Gas Co., 360 F.2d 79, 81 (6th Cir. 1966), and in Alles Corp. v. Senco Prods., Inc., 329 F.2d 567, 572 (6th Cir. 1964).

■ It should not be understood, however, that Rule 56 of Federal Rules of Civil Procedure governing summary judgment is inapplicable in antitrust cases. The Rule applies in all civil actions.

The Supreme Court recently applied the Rule in First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 284–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), and affirmed a summary judgment in a complex antitrust case which had been pending for more than eleven years. It distinguished Poller, where the competitive relationship between the parties was such as to make plausible plaintiff's argument that the defendant had embarked on a plan designed to put him out of business. In the present case it would be preposterous for plaintiff to make any such claim. Mr. Justice Marshall, who wrote the opinion for the Court, stated:

"The case at hand presents peculiar difficulties because the issue of fact crucial to petitioner's case is also an issue of law, namely the existence of a conspiracy. What Rule 56(e) does make clear is that a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him.[19] Yet the analysis

"[19]. Indeed it was for the precise purpose of overturning a line of cases in the Third Circuit holding that a party could successfully oppose summary judgment by relying on his well-pleaded allegations that Rule 56(e) was amended in 1963. See 6 Moore, Federal Practice ¶ 56.22[2], at 2821 (2d ed. 1966)."

of the facts undertaken above demonstrates that, due to the absence of probative force of Cities' failure to deal with Waldron as being in itself evidence of conspiracy, petitioner's position is, in effect, that he is entitled to rest on the allegations of conspiracy contained in his pleadings. Thus petitioner repeatedly states that Cities has never disproved its participation in the alleged conspiracy, despite the fact that the only evidence of such participation is his allegation that the failure to deal resulted from conspiracy.

Essentially all that the lower courts held in this case was that Rule 56(e) placed upon Waldron the burden of producing evidence of the conspiracy he alleged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegation were not susceptible of the interpretation which he sought to give them. That holding was correct. To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." *Id.* at 289–290, 88 S.Ct. at 1592–1593.

We approved the granting of summary judgment in the antitrust case of Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), rehearing denied, 375 U.S. 982, 84 S.Ct. 479, 11 L.Ed.2d 428 (1964).

We do not regard the issues in the present case as complex. The case does not even involve a refusal on the part of UPI to sell its services to plaintiff. The refusal was only its refusal to sell on terms proposed by plaintiff who was unwilling to buy on regular UPI terms.

The difficulty with plaintiff's position is that plaintiff intended only to fill the void created by the strike. It did not know how long the strike would last, whether one or two days, a week or a few months. When the strike was over it would lose its employees (who intended to and did return to their jobs with the News and the Free Press) and plaintiff would fold, as it did. In this precarious situation, plaintiff could make only short-term commitments.

On the day of its organization, Michael Dworkin, president and publisher of the Daily Press, telephoned the central division office of UPI in Chicago, spoke to the assistant central division manager (later identified as Mr. Peter Willett), and advised him that Daily Press was interested in obtaining UPI service [4] Dworkin asked whether there was such a thing as a strike clause in UPI's contracts with the Free Press and the News. Dworkin testified that Willett said that there was no such thing as a strike clause; that UPI could sell its services to whomever it pleased; and that he did not see any reason why the Daily Press could not have its service.

Dworkin testified that they then discussed the mechanics of acquiring UPI service. At this point Willett stated that Daily Press would have to sign a contract similar to the one which UPI had with the News and Free Press. According to Dworkin, Willett said:

"We cannot go into a town and service a newspaper on terms different than those we are servicing to the newspapers already."

4. Plaintiff endeavored to obtain news service from New York Times News Service, New York Herald Tribune Service, Chicago Tribune, Christian Science Monitor, Los Angeles Times—Washington Post News Service, New York Post, and the Canadian Press. All of these efforts were unsuccessful. Plaintiff did obtain service from Reuters on a week-to-week basis and Dow-Jones financial service on a month- to-month basis. It also obtained various nationally distributed features such as comics, columns and puzzles on month-to-month and ninety-day bases, and printed news which it gleaned from radio broadcasts. Plaintiff made no attempt to obtain Associated Press [AP] service because of undue delay believed to be involved in acquiring voted membership in AP.

Willett stated further:

"I will tell you what, though, if you can get the News and the Free Press to agree to our servicing this on a contract dissimilar from theirs you can have the service as soon as we can install it."

Dworkin advised Frank Gill, Executive Editor of the Daily Press (and Professor of Journalism at Wayne State University), of this conversation and suggested that Gill contact the News and Free Press to obtain the necessary clearances [5] Gill indicated that he knew both Lee Hills, publisher of the Free Press, and Harvey Patton, Manager-Editor of the News. Gill did call Patton, who told him:

"So far as the News is concerned this is a matter that concerns only you and United Press International. We want to have nothing to do with it. We don't want to be connected with you or your negotiations with United Press in any way whatsoever. If they want to sell you the service that is their business. We want no part of it."

Patton also said that there would be no repercussions from the News.

Lee Hills told Frank Gill that the position of the Free Press was the same as that of the News. Gill testified that Hills told him: "We see no reason to stop you." Hills testified that he told Gill:

"We have no objections at all and have no reason to object to such a newspaper as you are talking about buying United Press International."

Hills gave Gill the private telephone number in New York of Mr. Mims Thomason, President of UPI, so that Gill could contact him about obtaining service.

Mims Thomason testified that Lee Hills had telephoned him to advise that Professor Frank Gill of Wayne State University, who was associated with Daily Press, had called him (Hills) to inquire concerning the purchase of UPI news services; that Hills had referred Gill to Thomason; and that Thomason would be hearing from him. Thomason further testified that Hills told him:

"* * * [A]s far as the Free Press was concerned, they had no objection at all, of course, to our selling the Detroit Daily Press."

Thomason was of the impression that Hills wanted UPI to sell its services to the Daily Press.

Dworkin called Dale Johns, UPI's Central Division Manager in Chicago and related Gill's conversations with Patton and Hills. Dworkin claimed that Johns told him that he (Dworkin) had been grossly misinformed by Willett; that UPI's negotiations with Daily Press had nothing whatsoever to do with the News or Free Press; and that whether the newspapers agreed or disagreed was immaterial to UPI.

Dworkin said that Dale Johns then outlined UPI's proposed contract terms for the plaintiff, which terms included a five-year contract, with the last year of the contract to be paid in advance as a deposit, and with a rate of $2400 per week [6].

5. Gill testified that he made the suggestion because he did not know what the regulations were with regard to UPI.

6. Dale Johns described this conversation as follows:
"He [Dworkin] said that he and some others had started or were starting a daily newspaper in Detroit, and he wondered about buying our services. I asked him what field he was in, whether in the morning or evening field, and if this was a general circulation paper in the City of Detroit—the usual questions about what the operation would be like, and told him we would be glad to serve him.

"We had certain requirements about newspapers he would be expected to meet, and then it developed he did not intend to publish this newspaper, you know, except on a day-to-day basis until the newspaper strike in Detroit at that time ended.

"So I just told him we could not do this, that we did not sell our services on a day-to-day basis, or week-to-week basis. This just about terminated the

Dworkin then asked Frank Gill to call Thomason, UPI's president in New York, in an endeavor to go over Dale Johns' head. Gill testified that he called Thomason, who told him that he (Gill) had been misinformed by Willett; that UPI was guided by its own regulations or policy, which included a five-year contract with the last year to be paid in advance. Thomason told Gill that UPI service would cost $2480 per week on a five-year contract, with the fifth year to be placed in escrow before they started. Gill replied: "This is absurd because we don't know how long we're going to be in business."

Thomason then said:

"Those are the regulations * * *. I'd like to be able to do something else, but I can't. This is our rule."

Gill replied:

"This is silly because, as I say, we don't know. We may last a month; we may last two weeks; we may go on for six months, I don't know. This looks like a long strike."

Thomason recalled this conversation as follows:

"* * * Our conversation was rather brief, because he told me immediately that this was an interim newspaper, that there was no intention of publishing it permanently, but, nevertheless, he wanted to know the general terms and conditions.

And I told him. I inquired first as to whether he was going to publish an afternoon paper or a morning paper, and how many days, and told him that the rate would depend upon which field he was in; and if it was to be six days only, it would be either six-sevenths of the Detroit News rate or the morning rate, six-sevenths of the Detroit Free Press rate. I said we would have to be assured of financial stability, that the circulation was at least 85 per cent paid, and that we would require a normal five-year contract and a deposit guaranteeing performance on the contract equal to the amount of the fifth year's contractual rate."

Thomason testified that the News was not mentioned in the conversation. He further said that if there were an interim newspaper in Detroit today, he would not sell to it regardless of whether the other two newspapers were on strike, or whether he was encouraged to do so by them.

UPI's reason for seeking five-year contracts for its news service was explained by Thomason as follows:

"We have to have the stability of a long-term contract, and we cannot afford to make exceptions. We must have long-term contracts. If we were to write a contract with a newspaper on a week-to-week or a month-to-month basis, we would then be compelled to extend the same short-term cancellation privilege to many other newspapers. We cannot be in a position of spending about a million dollars a week covering news of the world and having our newspaper clients decide that the news is very dull this month, we will do without UPI; but then to have the war crank up again some place and then have the subscriber say, 'We will put it back in—We will take it.'"

The five-year contract was regarded by UPI as being of crucial importance.

conversation. I think there was some general conversation at that time about cost. He wanted to know something about what it might cost. I believe I gave him a round figure that it might cost as much as $2400 a week. I think at some time I used that same maximum for all services he might want to use.

* * * * *

"* * * I told him that our requirement for a newspaper was a five-year contract with the last year paid in advance, and we had to have guaranty of 85 per cent paid circulation, that it would be helpful if we had a financial statement * * *

"* * * When it was determined we couldn't serve him on a day-to-day basis, that terminated the conversation * * *."

Mr. Thomason stated that it was "the most important thing that we have." Thomason expressed the view that short-term contracts with interim newspapers would "jeopardize our five-year contract program" because other UPI clients might request short-term cancellation privileges.

The Daily Press offered first $2,000, and later $3,000, a week, payable two weeks in advance, plus installation charges, for UPI's state wire, news pictures, and national wire services. This offer was rejected on the basis of UPI's policies.

In August, 1964, Daily Press again contacted both Dale Johns and Mims Thomason about UPI service and again the result was the same. UPI was unwilling to sell its service on terms other than a five-year contract. In addition, Thomason indicated that "when a newspaper goes into any town under any condition, we expect that paper to pay the existing rate paid by our client in that field and in that city." Thus, the rate to be charged was to be based upon the rate charged the existing newspapers in the morning or evening fields, with proper modifications for the number of days per week the paper was to be published [7].

In his talk with Dale Johns in August, 1964, Dworkin indicated that they were thinking about publishing a suburban newspaper at the conclusion of the strike, but apparently that was just an idea and they had no actual plans. Johns reiterated that UPI could not serve him on a day to day basis. Johns testified that near the end of the conversation, Dworkin said:

"'Well, really, we don't need your service anyway. * * * We are getting along fine. We have Reuters,

the Dow-Jones Wire' and he [listed] some feature services, some feature picture services. He said he had correspondents in New York, Washington and some other cities * * *.'"

Dale Johns testified that a very small number of contracts for terms shorter than five years did exist, but that these were granted to established newspapers, and none to his knowledge was granted to new papers.

In October, 1964, Siegel of the Daily Press contacted UPI's Commercial Photo Division in an unsuccessful effort to purchase pictures of President Kennedy, Lee Harvey Oswald and his family, and Chief Justice Warren, to use in connection with a news story on the Warren Report. Mr. Thomason explained that spot news pictures are available only to regular customers. Other pictures are sold to anyone on an ala carte basis.

UPI's 1934 news service contract with the News, which was for a term of five years, and was renewable for five-year terms, was modified in 1942 so as to extend for an indefinite term, with a one-year cancellation provision. The telephoto contract with the News was for a two-year term, and renewed itself unless either party cancelled the contract.

In 1955, UPI and the Free Press entered into a news service agreement for a term of two years. This agreement was modified in 1959 to provide for a five-year term with an "Asset Value Credit" provision by which UPI would give a five percent rebate at the end of each five-year term, provided Free Press did not cancel at the end of that period.

When the strike began, UPI immediately reduced the charges to the News and the Free Press by the physical cost savings of not having to transmit news to them. After three weeks, UPI re-

7. The record is not clear as to the amount UPI was to charge Daily Press. Apparently UPI charged the Free Press (a morning newspaper) prior to the strike, $961.78 for A and B trunk wires, sports wire and business wire, and charged the News $1,981.74 per week for news service plus $650.59 per week for telephoto serv-

ice. The lack of certainty in the record, however, has no real bearing on the alleged existence of a combination or conspiracy. Instead, it seems to indicate that the figures given were approximate, and that the parties never really reached a precise cost figure.

duced the charges for the services themselves by ten percent per week, so that after ten additional weeks UPI was receiving no revenue from either the News or the Free Press.

The separate written contracts between UPI and the News and the Free Press each provide in part:

"It is mutually agreed that United Press reserves the right to make working arrangements and exchanges of news and wire facilities with other press associations, publishers or persons and to sell said news Report to any other party or parties."

Plaintiff did not claim that there was any direct proof of any agreement, combination or arrangement on the part of the defendants to deprive plaintiff of wire services; neither do we find any circumstantial evidence from which inferences could properly be drawn, even tending to establish an agreement. In their depositions the knowledgeable officers and employees of plaintiff were interrogated on this subject, and none of them knew of any activities of defendants which were directed at preventing plaintiff from obtaining wire services. On the contrary, the sworn testimony of Harvey W. Patton and Peter B. Clark of the News, and of Lee Hills of the Free Press was clear that they did nothing to interfere with plaintiff's acquisition of wire service from UPI. Lee Hills went even further. He tried to help plaintiff obtain such service. There was no proof of any discussion between the News and the Free Press concerning UPI's furnishing wire service to plaintiff.

The District Court properly characterized plaintiff's proof as follows:

"[P]laintiff's case is supported by inference drawn from inference based upon inference, supported by facts which are in themselves mere conclusions, and inferences drawn from other facts."

█ There was not an iota of proof that either the News or the Free Press induced UPI not to sell its wire services to plaintiff. There was no proof of any conspiracy.

Plaintiff was never a competitor of the two struck newspapers, or of UPI. During the strike the News and the Free Press did not publish, and plaintiff had virtually a monopoly of the newspaper market in Detroit, and made the most of it. When the strike was over, plaintiff ceased publication and went out of business. The News and the Free Press then resumed publication. Plaintiff never was anything more than an interim newspaper.

█ Plaintiff sought to show by hearsay evidence that two days before the strike was over, Peter B. Clark of the News called the president of Wayne State University in Detroit, in an effort to put pressure on Professor Gill to terminate his employment with plaintiff. The University president did not so testify, and Mr. Clark denied that any such conversation ever took place. Hearsay evidence would not have been admissible in a trial of the case on its merits. It cannot be considered on a motion for summary judgment. Rule 56(e) Fed.R. Civ.P. Furthermore, the alleged conversation took place long after UPI had refused to sell its services on terms agreeable to plaintiff. There was no proof that UPI or the Free Press had knowledge of the alleged conversation.

Plaintiff, relying on Milgram v. Loew's, Inc., 192 F.2d 579, 583 (3d Cir. 1951), cert. denied, 343 U.S. 929, 72 S. Ct. 762, 96 L.Ed. 1339 (1952), argues that UPI acted contrary to its own economic self-interest in not accepting plaintiff's offer of $3,000 a week, payable two weeks in advance, and that this strengthens the inference of conspiracy, which it seeks to draw. We are unable to perceive how any economic self-interest of UPI, not common to the News or the Free Press, connects either one of them to a conspiracy.

The District Judge effectively answered the argument as to UPI when he said:

"* * * We fail to see (and we have not been shown) the economic in-

**134**

terest on the part of UPI which would indicate that a contract should be concluded with a newspaper which, by its own admission, might not last out the week. It might be a different situation if Daily Press had ever had any intention of even attempting to outlast the strike, but on this the record is clear. Daily Press was created to fill the void caused by the strike. It intended to fold its tent with the end of the strike, at which time its officers and employees would go back to their normal jobs on the defendant papers or elsewhere. Negotiations at this time were constant and the strike could end any time. Is it in UPI's economic self interest to assume, as was possible, that the strike would last a long time and this would be a customer worth having? The record clearly indicates that as a self-admitted interim newspaper, fulfilling a vital need in the City of Detroit, Daily Press was not such a customer."

■ The fact that E. W. Scripps Trust owns 2% of the common stock of the News and indirectly owns a controlling interest in UPI is no proof of any unlawful combination. We also fail to see the relevancy of the fact that Peter B. Clark, president and publisher of the News, is the great-grandson of James E. Scripps, founder of the News, and a half brother of E. W. Scripps, who was the founder of the predecessor of UPI.

■ When the motions for summary judgment were filed, plaintiff could no longer rely on the conclusory allegations of its complaint. Rule 56(e) of Fed.R. Civ.P. requires that a party opposing a properly supported motion for summary judgment shall produce by affidavit or otherwise "specific facts showing that there is a genuine issue for trial." First Nat'l Bank of Ariz. v. Cities Serv. Co., supra, 391 U.S. at 270, 88 S.Ct. 1575. This, plaintiff was unable to do.

Our observations with respect to the alleged Section 1 violation apply with equal force to the claimed Section 2 violation. There was no proof that the News and the Free Press, individually or jointly, attempted to or did monopolize the market for news services, newspapers and newspaper advertising in Detroit, or that they agreed that no new newspaper of general circulation, published in Detroit, would be permitted to obtain UPI wire services, or that they or either of them attempted to prevent the organization of new newspapers or the continued existence of competing newspapers in Detroit by coercing wire services to refuse to service them.

There remains for consideration the question whether UPI's unilateral refusal to come to terms with plaintiff operated to violate Section 2 by monopolizing or attempting to monopolize the market for news wire services.

Contrary to its previous argument that it would have been to UPI's economic self-interest to accept plaintiff's offer of $3,000 a week, it now contends that it was up to UPI's self-interest to refuse to deal with plaintiff "to avoid any conflict with its large metropolitan daily customers." But no conflict existed here, because the News and Free Press were not publishing at the time and neither newspaper opposed UPI's dealing with plaintiff. The Free Press encouraged it.

■ It is settled that mere refusal to deal is not a violation per se of Section 2. First Nat'l Bank of Ariz. v. Cities Serv. Co., supra.

In Ace Beer Distributors, Inc. v. Kohn, Inc., supra, 318 F.2d at 286–287, Judge Shackelford Miller, Jr., who wrote the opinion for our Court, said:

"A manufacturer has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. A refusal to deal becomes illegal under the Act only when it produces an unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of a monopoly. United States v. Parke, Davis & Co., 362 U.S. 29, 32, 80 S.Ct. 503, 4 L.Ed.2d 505; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340

U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162. The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act."

As we pointed out before, our case does not even involve a refusal to deal with plaintiff. UPI was willing to deal with plaintiff on the same basis as its other contract customers. Plaintiff, being an interim newspaper and thus not knowing how long it would be in business, wanted a special deal. Failure of UPI to give plaintiff a special deal and accept its offer of $3,000 per week, did not operate to create or attempt to create a monopoly.

It is not clear to us just how UPI's failure to come to terms with plaintiff could create a monopoly or could be an attempt to monopolize. The proof does not show that UPI had the power to control prices or unreasonably restrain trade[8] There was no evidence of a specific intent to monopolize. Kansas City Star Co. v. United States, 240 F.2d 643 (8th Cir. 1957), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957).

At the time Mims Thomason's deposition was taken, UPI was not earning a profit and made no profit for the year prior thereto.

No tie-in is involved in this case for UPI made no contract with plaintiff.

Plaintiff claims that if it had had UPI's service it would have received much more advertising revenue. It did pretty well without it, namely, $1.8 million, in four months. We would think that its advertisers would have been concerned about how long plaintiff would remain in business, rather than worried about whether plaintiff had UPI wire service.

In our judgment, there was an entire failure of proof on the monopoly issue.

 It is further contended that the Court did not permit adequate discovery. We disagree. Plaintiff had extensive discovery. In our judgment, additional discovery would not have affected the motions for summary judgment. We find no abuse of discretion on the part of the District Judge.

Affirmed.

---

8. Plaintiff submitted statistics which indicate that UPI has less than 50% of the national wire service market.