417 F.2d 75
 Harry GRANADER in his individual capacities of his separarte
businesses and as a stockholder and director of Public Bank,
and as a member of the following classes; the classes being
the stockholders of Public Bank, a Michigan banking
corporation, and the Directors of the Public Bank, a
Michigan banking corporation, Plaintiff-Appellant,
v.
PUBLIC BANK, a Michigan banking corporation et al.,
Defendants-Appellees.
 No. 18877.
 United States Court of Appeals Sixth Circuit.
 Oct. 15, 1969.
 
 William I. Liberson, Detroit, Mich., for plaintiff-appellant; Cyril Abramson, (of counsel) Detroit, Mich., on brief.
 George E. Parker, III, Detroit, Mich., for Federal Deposit Ins. Co.; Miller, Canfield, Paddock & Stone, Peter P. Thurber, Detroit, Mich., S. Rex, Lewis, Gen. Counsel, J. Lovering Trucott, Asst. Gen. Counsel, Washington, D.C., on brief.
 John A. Ziegler, Jr., Detroit, Mich., for Bank of the Commonwealth, and others; Parsons, Tennent, Hammond, Hardig & Ziegelman, William H. Merrill, Detroit, Mich., on brief.
 James J. Wood, Asst. Atty. Gen., Lansing, Mich., for State of Mich. and others; Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Maurice M. Moule, Asst. Atty. Gen., Lansing, Mich., on brief.
 Before WEICK, Chief Judge, and EDWARDS and PECK, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 This is an appeal from a summary judgment entered by a District Judge in the United States District Court for the Eastern District of Michigan, Southern Division, in favor of defendants-appellees named above.
 
 
 2
 In its form this action is a civil suit for treble damages, alleging injury to plaintiff resulting from a conspiracy on the part of defendants to have defendant Bank of the Commonwealth (Commonwealth) acquire all of the assets of defendant Public Bank (Public) in violation of federal law. The provisions involved are the antimonopoly sections of the Sherman Act, 1 and 2 (15 U.S.C. 1 & 2 (1964)), the prohibitions against restraint of trade and competition of the Clayton Act, 7 (15 U.S.C. 18 (1964)), and the due process provision of the Fourteenth Amendment.
 
 
 3
 This is no ordinary antitrust case. Plaintiff was a stockholder and a Director of the Public Bank, a state bank located in Detroit, Michigan. Public Bank has not been placed in receivership and substantially all of its assets have been sold to defendant, Bank of the Commonwealth-- an existing Detroit bank which appellant alleges had 6.1% Of the banking business (as measured by assets) in the Detroit area prior to this acquisition and 7 1/2% After. The petitions for receivership and for approval of sale of assets were filed by defendant, Charles D. Slay, Commissioner of Banking for the State of Michigan, and by defendant, Federal Deposit Insurance Corporation, which had insured Public Bank's deposits. The FDIC was appointed receiver of Public Bank and immediately concluded a previously negotiated sale of assets to Commonwealth, extending to Commonwealth, in order to induce the purchase, a $10,000,000 FDIC guarantee against losses. Commonwealth in turn assumed all of Public's liabilities and took over and opened its offices the morning after the receivership and sale were concluded, without interruption of Public's business. Other defendants are individual officers of Commonwealth and accountants, all of whom played various roles in the receivership and sale of assets.
 
 
 4
 Plaintiff Granader was present when the sale of assets of Public to Commonwealth was approved by the Board of Directors of Public (on terms somewhat less favorable to Public than those negotiated by FDIC). He signed the tentative agreement. Granader was also a party to the contested state receivership proceedings and participated in the 42 days of trial.
 
 
 5
 There were also some cloak and dagger aspects to the receivership proceedings which flavor this record. The precarious state of Public Bank became known to both the Banking Commissioner of Michigan and the FDIC at least by the end of 1965. Various methods of strengthening it were attempted. These efforts failed. So did efforts of Public Bank Directors and subsequently the FDIC to sell the bank or its assets. By September 23, 1966, the impending insolvency of Public was known but was carefully kept from public gaze by the two regulatory agencies for fear of a run on the bank's assets. Both agencies participated in an approach to the Wayne County Circuit Court, asking for a hearing after court hours on an important item of litigation, and by blind draw the responsibility for conducting such a hearing was assigned to Judge Benjamin Burdick. In an extraordinary past midnight court session Judge Burdick heard the testimony offered by the FDIC and the Banking Commissioner on the Banking Commissioner's petition for receivership of Public Bank, made a tentative finding of insolvency, and appointed FDIC as the receiver. FDIC then negotiated a sale of the assets of Public Bank to the Bank of the Commonwealth. A similar sale had previously been approved by the Federal Reserve Board on September 23, 1966, as a result of an agreement on approximately the same terms negotiated between the Directors of Public Bank and the Bank of the Commonwealth.
 
 
 6
 Subsequent to these proceedings, Judge Burdick disqualified himself and the receivership case was assigned for full hearing to Circuit Judge Blair Moody, Jr. He conducted a hearing which took testimony for 42 days and then entered findings, the relevant ones being that as of October 12, 1966, Public Bank was insolvent and that the sale of Public Bank to the Bank of the Commonwealth was 'the best possible and obtainable offer.' On the state law issues involved in the receivership proceeding, Judge Moody summarized his findings as follows:
 
 
 7
 'This Court concludes that on the evening of October 11, 1966, it was not only 'expedient' but necessary that a receiver be appointed for Public Bank for reasons including the following:
 
 
 8
 '1. The fact that Public Bank was then insolvent.
 
 
 9
 '2. The fact that the September 20th report of condition of Public, although then unpublished, was to be momentarily released reflecting a disastrous reduction in the capital account of the bank.
 
 
 10
 '3. The fact that an 8(A) citation was issued nearly three months before the FDIC reflecting findings of unsafe and unsound practices which citation was not yet released to shareholders or the general public but was to be revealed in several days.
 
 
 11
 '4. The fact that an assessment letter of the Michigan Banking Commissioner demanded an assessment of $12.44 per share of stock to cure a capital impairment of over $5,700,000.00, which letter was not revealed yet to shareholders but was to be revealed in several days.
 
 
 12
 '5. The fact that successive attempts by Public to obtain additional capital ended in failure.
 
 
 13
 '6. The fact that successive attempts to effectuate mergers with stronger Detroit banks were unsuccessful.
 
 
 14
 '7. The fact that there was no other known purchaser of substance than Commonwealth which purchase agreement was to expire on October 14th.
 
 
 15
 '8. The fact that Public was experiencing great difficulty in completing a proxy statement required by Federal Law and in accordance with the terms of the purchase agreement with Commonwealth.
 
 
 16
 '9. The fact that the accountants who Public relied upon to assist them in preparing the proxy statement disassociated themselves from the project due to a difference of opinion with Public's management over the handling of reserves for loss of loan accounts.
 
 
 17
 '10. The fact that it became impossible to hold a shareholders meeting of Public to approve the proposed sale of Public to Commonwealth in view of the time limitations of the sale agreement and the inability of Public to prepare a satisfactory proxy statement.
 
 
 18
 '11. The fact that there was a continued worsening of the liquidity position of Public.
 
 
 19
 '12. The fact that there was a continuing daily operating loss being suffered by Public further impairing capital funds.
 
 
 20
 '13. The fact that there is a continued severe downward trend of deposits by customers of Public.
 
 
 21
 '14. The fact that it was necessary for Public in order to meet its clearings, effectuated extraordinary daily borrowings from the Federal Reserve System which sum as of October 11th amounted to $9,500.00. Very little security remained in Public's portfolio for further borrowings from the Federal Reserve.
 
 
 22
 '15. The fact that there were uninsured depositors in the amount of $10,000,000.00 then relying upon the stability of Public.
 
 
 23
 '16. The fact there was the imminency of failure that lurked over the bank on every new day, acknowledged by Public's President, McGuire, by his statement in August 1966, 'that it was doubtful if the bank could last one week.'
 
 
 24
 'In addition to these facts, several other points clearly reflect that the immediate sale by the receiver in accordance with the terms of the FDIC-Commonwealth Agreement B was clearly justified. Such additional circumstances were:
 
 
 25
 '1. If an immediate sale was not effectuated, the standby Agreement B was in jeopardy since a continued operation was essential to Commonwealth as well as the FDIC.
 
 
 26
 '2. That a prompt sale would effectuate a conservation of the going value of Public's assets actively handled by a vital purchaser as against the losses customarily incident to liquidation of a closed bank.
 
 
 27
 '3. That an uninterrupted operation maintained the stability and confidence in the banking community by the general public.
 
 
 28
 '4. That an immediate sale protected all depositors and creditors.
 
 
 29
 'The following conclusions are made with respect to the 'fairness' of the sale:
 
 
 30
 '1. The FDIC prior to its appointment as receiver, attempted to assist Public and made every reasonable effort to obtain the best possible offer for the purchase of the assets and assumption of the liabilities of that bank. Upon becoming acutely concerned regarding the condition of Public in the summer of 1966, the Chairman of the Board of the FDIC, with Mr. Roddy, visited every major bank located in the Detroit area, save one, in an effort to ascertain a prospective purchaser of Public. Two banks reflected no interest at all; a third only expressed vague interest in concert with others; a fourth bank expressed some interest but placed unascertainable conditions of aid upon FDIC. The best possible and obtainable offer with reasonable FDIC assistance was that from Commonwealth Bank.
 
 
 31
 '2. A specific contract was entered between Commonwealth and Public which thereafter was amended to basically conform with the eventual receiver's sale agreement between Commonwealth and FDIC. No better offer was made to Public by any source nor was any offer from any source seriously considered acceptable by the Directors of Public Bank up to and including October 11, 1966. Furthermore, in almost a period of one year thereafter, there has been, to the knowledge of this Court, no better offer subsequently made to the receiver up to the present time.
 
 
 32
 '3. The good faith of all parties concerned is reflected by the fact that it was understood between Commonwealth and FDIC that if a better deal arose which Public could make, Commonwealth would step aside in favor of the concern making the better offer.
 
 
 33
 '4. Prior to and subsequent to its arrangement with Bank of the Commonwealth as of September 1, 1966, Public vigorously attempted to obtain a better agreement than that between it and Commonwealth. Its tentative arrangement with City National Bank fell apart within a week or so when the purchaser became aware of the true precarious position of Public. Discussions with Michigan Bank never got off the ground. The last minute offers made by the Zimmerman group as reflected in the minutes of Public were never seriously considered nor should they have been as they were financial schemes and not sincere proposals to add sufficient capital to the dying bank.
 
 
 34
 '5. Public through its good offices could obtain no better recapitalization plan. The several attempts of Director Mebus in the spring and summer of 1966, never blossomed. Negotiations with Mr. Leeman never developed.
 
 
 35
 '6. No higher bid was tendered as a premium for the going concern value of the branch offices and the deposits of Public. The receiver made strenuous efforts to ascertain likely prospects. Speculative inferences as to what is a hypothetical true value of a branch bank outlet must be differentiated from an actual cash-over-the-barrel-head offer made during exigent circumstances. There were simply no higher bids obtainable.
 
 
 36
 '7. At 12:30 a.m. on October 12th, the Court had the alternative to order a strict liquidation of Public in lieu of approving the proposed receiver's sale agreement with Commonwealth. Such alternative was clearly less desirable than a sale to Commonwealth. The premiums that Commonwealth paid for the right to conduct business at the banking house locations and for the deposits would not have been available. Loans would have realized less in the hands of an existing commercial bank. Approximately $10,000,000.00 of uninsured deposits might never have been paid. The FDIC guaranty fund made available to facilitate the sale to Commonwealth was for the purpose of avoiding a bank failure which would be contrary to the public interest, as well as the effect such failure would have on other banks.
 
 
 37
 '8. The willingness of the FDIC to guarantee $10,000,000.00 against loss to Commonwealth due to its grave concern over the effect of a bank failure, reflects its conviction of the propriety of the sale.
 
 
 38
 '9. The receiver's sale agreement with one different provision was approved by an overwhelming number of the Board of Directors of Public, as the amended bank-to-bank agreement of September 1 and amended September 29, was the same as the receiver's sale agreement. The only provision which was different related to the 15 day period after takeover in which the premium on deposits would be calculated. This provision was vigorously negotiated by both parties and is considered appropriate and fair by this Court in view of the fact that Commonwealth had to assume upon the transfer, the pallor of a dead bank.
 
 
 39
 '10. This same sale contract between the receiver and Commonwealth was to have been recommended by the Board of Directors of Public in their proposed proxy statement to be approved by the shareholders as the best possible alternative under the circumstances.
 
 
 40
 '11. The receiver's sale agreement was vigorously bargained for by both the receiver and Commonwealth and is fair and reasonable on its face.'
 
 
 41
 Appellant in this case and appellees Slay, FDIC, Public and Commonwealth were parties to and participants in the proceedings before Judge Moody. Subsequent to the receivership, Granader filed this suit in the Eastern District of Michigan, claiming an antitrust conspiracy between the two banks, FDIC, the Banking Commissioner of Michigan and the other named defendants. A motion for summary judgment was filed on behalf of all defendants. After completion of the state court proceedings, the District Judge granted said motion. He held that plaintiff, having participated in the Wayne County Circuit Court action, was collaterally estopped from denying the validity of the critical findings of fact 1) that Public Bank was insolvent on the date concerned, and 2) that the sale to Commonwealth was fair, as compared to any other alternative available. He then held that these findings warranted summary judgment for defendants. He relied largely upon the failing company doctrine of International Shoe Co. v. FTC, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930). The District Judge summarized his views as follows:
 
 
 42
 'It is this court's opinion that summary judgment is granted to defendants on 7 violation of the Clayton Act, based upon the defense of the failing company doctrine, the complaint is dismissed on 2 violation of the Sherman Act as the plaintiffs fail to allege defendants have monopoly power and it is dismissed on 1 violation of the Sherman Act as plaintiffs fail to allege what violative act was done in restraint of trade. The question of deprivation of property without due process is moot in light of Judge Moody's opinion that the plaintiffs will be compensated for the assets.'
 
 
 43
 On appeal appellant claims that the District Judge erred in dismissing his Sherman Act and Fourteenth Amendment claims for failure to state a cause of action. He also claims reversible error in the District Judge's reliance upon the facts found by Judge Moody in the state court trial and in the District Judge's failure to grant a District Court trial de novo.
 
 
 44
 We find no violation of federal due process standards in the state court receivership proceedings. While the temporary receivership order was entered summarily and without notice, the justification for the action in the extremely hazardous condition of Public Bank was great. Maxwell v. Enterprise Wall Paper Mfg. Co., 131 F.2d 400, 403 (3d Cir. 1942); Tennessee Pub. Co. v. Carpenter, 100 F.2d 728, 731-32 (6th Cir.), cert. denied, 306 U.S. 659, 59 S.Ct. 775, 83 L.Ed. 1056 (1938); Tuller v. Wayne Circuit Judge,243 Mich. 239, 219 N.W. 939 (1928). And subsequently, the parties interested in Public Bank not only had their day in court, they had 42 of them.
 
 
 45
 We agree with the District Judge that plaintiff's complaint does not recite facts which state a cause of action under 2 of the Sherman Act. Defendants are not asserted to have had or have gained monopoly power in the Detroit area banking field at any time in these proceedings.
 
 
 46
 As to appellant's 7 Clayton Act claims, we would like carefully to state what we decide here. We do not hold that plaintiff's complaint as to this section failed to state a cause of action under the antitrust laws warranting trial in a federal court. On the contrary, it did state such a claim. See United States v. Diebold, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Further, we do not hold that the state court action supplanted or took precedence over the federal court antitrust action. See Mach-Tronics, Inc. v. Zirpoli, 316 F.2d 820 (9th Cir. 1963).
 
 
 47
 What we do hold is that the Wayne County Circuit Court was a court of competent jurisdiction to try the receivership action assigned to it, that all of the parties to this antitrust action were parties and participants in the receivership action, that two factual issues critical to the receivership litigation (namely, whether Public Bank was insolvent and whether the Commonwealth offer was the only 'prospective purchaser' /1/ available) were also critical to the federal antitrust action, that these issues having been decided affirmatively by full scale trial in the Wayne County Circuit Court, plaintiff in this case was estopped to deny these critical findings in the antitrust case, and finally, that the District Judge was correct in holding that these two factual findings warranted summary judgment for defendants as a matter of federal law in the 7 Clayton Act claim and that he could have disposed of the 1 Sherman Act claim on the same ground. See Citizen Publishing Co. v. United States, 394 U.S. 131, 136; 145-146, 89 S.Ct. 927, 22 L.Ed.2d 148 (Stewart, J., dissenting) (1969).
 
 
 48
 As we see the matter, the critical appellate issue in this case is whether or not appellant is estopped to deny the two findings of fact by the Wayne County Circuit Court which we have held to be dispositive.
 
 
 49
 In a leading case, the United States Supreme Court has discussed the relationship between the doctrines of res adjudicata and collateral estoppel:
 
 
 50
 'The general rule of res judicata applies to repetitious suits involving the same cause of action. It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195. The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. See Von Moschzisker, 'Res Judicata,' 38 Yale L.J. 299; Restatement of the law of Judgments, 47, 48.
 
 
 51
 'But where the second action between the same parties is upon a different cause or demand, the principle of res judicata is applied must more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' Cromwell v. County of Sac, supra, 353, 24 L.Ed. 195. And see Russell v. Place, 94 U.S. 606, 24 L.Ed. 214; Southern Pacific R. Co. v. United States, 168 U.S. 1, 48, 18 S.Ct. 18, 42 L.Ed. 355; Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 671, 64 S.Ct. 268, 88 L.Ed. 376. Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, res judicata is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. See Restatement of the Law of Judgments, 68, 69, 70; Scott 'Collateral Estoppel by Judgment,' 56 Harv.L.Rev. 1.' Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597-98, 68 S.Ct. 715, 92 L.Ed. 898 (1948).
 
 
 52
 With particular regard to collateral estoppel, the Supreme Court has also said:
 
 
 53
 'The general principle announced in numerous cases is that a right, question or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their prives; and even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue and actually determined by them.' Southern Pacific R.R. v. United States, 168 U.S. 1, 48-49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897).
 
 
 54
 Accord, e.g., Partmar Corp. v. Paramount Pictures Theatres Corp., 347 U.S. 89, 74 S.Ct. 414, 98 L.Ed. 532 (1954); United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); Seattle First National Bank v. Hilltop Realty, 383 F.2d 309 (9th Cir. 1967), cert. denied, 390 U.S. 1025, 88 S.Ct. 1411, 20 L.Ed.2d 282 (1968); Restatement, Judgments 68 (1942).
 
 
 55
 Federal courts may take judicial notice of proceedings in other courts of record. Pennsylvania v. Brown, 373 F.2d 771, 778 (3d Cir. 1967); Murray v. State of Louisiana, 347 F.2d 825 (5th Cir. 1965); Wagner v. Fawcett Publications, 307 F.2d 409, 411 (7th Cir. 1962), cert. denied, 372 U.S. 909, 83 S.Ct. 723, 9 L.Ed.2d 718 (1963); Berkowitz v. Philadelphia Chewing Gum Corp., 303 F.2d 585 (3d Cir. 1962); Lambert v. Conrad, 308 F.2d 571 (9th Cir. 1962); Wilson v. Sigler, 285 F.2d 372 (8th Cir. 1961); St. Paul Fire & Marine Ins. Co. v. Cunningham, 257 F.2d 731 (9th Cir. 1958). Here the state court proceedings were within the jurisdiction of the District Court and were directly concerned with the same parties and the same subject matter.
 
 
 56
 We believe that it was appropriate for the District Judge in this case to take judicial notice of the state court receivership proceedings and of Judge Moody's findings of fact therein. Pennsylvania v. Brown, 373 F.2d 771, 778 (3d Cir. 1967); Wagner v. Fawcett Publications, 307 F.2d 409, 411 (7th Cir. 1962), cert. denied, 372 U.S. 909, 83 S.Ct. 723, 9 L.Ed.2d 718 (1963).
 
 
 57
 We also believe that the Wayne County Circuit Court was 'a court of competent jurisdiction'; that the parties before that court included 'the same parties' as are involved in this case; and that the two facts crucial to this case were 'distinctly put in issue and directly determined' by the Wayne County Circuit Court.
 
 
 58
 We therefore hold that the facts 1) that Public Bank was insolvent and 2) that the sale of its assets to Commonwealth was the only realistic alternative to liquidation were properly considered as established by the District Judge in determining the motion for summary judgment.
 
 
 59
 The District Judge's hearing and consideration of this motion was, we believe, the 'review de novo' referred to in the Bank Merger Act, 12 U.S.C. 1828(c)(7) (A) (1964), as amended, (Supp. IV, 1965-1968). See United States v. First City Nat'l Bank of Houston, 386 U.S. 361, 366-368, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). For it was his obligation (as it is ours) to apply the federal antitrust law to the established facts. We believe his opinion indicates that he did so.
 
 
 60
 We recognize, of course, that summary judgments are not favored in antitrust litigation. Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). But in an antitrust case, where there clearly are no genuine issues of fact to try, summary judgment may be correctly awarded. Citizen Publishing Co. v. United States, 394 U.S. 131, 136, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Daily Press Inc. v. United Press Int'l, 412 F.2d 126 (6th Cir. 1969); American Mfrs. Mut. Ins. Co. v. Am. Broadcasting-Paramount Theatres, Inc., 388 F.2d 272, 279-280 (2d Cir. 1967). We believe that if a motion for summary judgment is ever appropriate in an antitrust case, it must be in this one. The District Judge relied for disposition of plaintiff's 7 Clayton Act claims upon the failing company doctrine. In the International Shoe Co. case, which established this doctrine, the Supreme Court said:
 
 
 61
 'Shortly stated, the evidence establishes the case of a corporation in failing circumstances, the recovery of which to a normal condition was, to say the least, in gravest doubt, selling its capital to the only available purchaser in order to avoid what its officers fairly concluded was a more disastrous fate. It was suggested by the court below, and also here in argument, that instead of an outright sale, any one of several alternatives might have been adopted which would have saved the property and preserved competition; but, as it seems to us, all of these may be dismissed as lying wholly within the realm of speculation.
 
 
 62
 'In the light of the case thus disclosed of a corporation with resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure with resulting loss to its stockholders and injury to the communities where its plants were operated, we hold that the purchase of its capital stock by a competitor (there being no other prospective purchaser), not with a purpose to lessen competition, but to facilitate the accumulated business of the purchaser and with the effect of mitigating seriously injurious consequences otherwise probable, is not in contemplation of law prejudicial to the public and does not substantially lessen competition or restrain commerce within the intent of the Clayton Act. To regard such a transaction as a violation of law, as this court suggested in United States v. U.S. Steel corp., 251 U.S. 417, 446-447, 40 S.Ct. 293, 64 L.Ed. 343, would 'seem a distempered view of purchase and result.' See also American Press Ass'n v. United States, 7 Cir., 245 F. 91, 93-94.' International Shoe Co. v. FTC, 280 U.S. 291, 301-303, 50 S.Ct. 89, 93, 74 L.Ed. 431 (1930).
 
 
 63
 Assuming as we must that the failing company doctrine still has validity (see Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969)), the words we have just quoted apply a fortiori to the instant appeal.
 
 
 64
 In addition, the Supreme Curt has intimated that the failing company doctrine may have greater applicability as to bank mergers:
 
 
 65
 'Arguably, the so-called failing-company defense, see International Shoe Co. v. Federal Trade Comm'n, 280 U.S. 291, 299-303, 50 S.Ct. 89, 74 L.Ed. 431, might have somewhat larger contours as applied to bank mergers because of the greater public impact of a bank failure compared with ordinary business failures.' United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 372 n. 46, 83 S.Ct. 1715, 1746, 10 L.Ed.2d 915 (1963).
 
 
 66
 We also recognize that the Supreme Court has just reminded us in the Citizen Publishing Co. case that:
 
 
 67
 'The failing company doctrine plainly cannot be applied in a merger or in any other case unless it is established that the company that acquires the failing company or brings it under dominion is the only available purchaser. For if another person or group could be interested, a unit in the competitive system would be preserved and not lost to monopoly power.' Citizen Publishing Co. v. United States, 394 U.S. 131, 138, 89 S.Ct. 927, 931, 22 L.Ed.2d 148 (1969).
 
 
 68
 But we believe that the question of availability of another purchaser was thoroughly tried and decided in the negative in the state court receivership proceedings and that plaintiff, for reasons we have stated, was estopped to deny this fact.
 
 
 69
 We believe the District Judge was correct in dismissing appellant's 1 Sherman Act claims for the reason he gave. We also believe that the failing company defense applies to the 1 Sherman Act claims of appellant just as it does to his 7 Clayton Act claims. See Citizen Publishing Co. v. United States, supra at 136, 145-146, 89 S.Ct. 927, 22 L.Ed.2d 148 (Stewart, J., dissenting). We find no need to pass on appellee FDIC's immunity claim.
 
 
 70
 The judgment of the District Court is affirmed.
 
 
 71
 ---------------
 
 
 
 1 Citizen Publishing Co. v. United States, 394 U.S. 131, 137, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969).