The FIRST NATIONAL BANK OF
BOSTON, Plaintiff,

v.

William H. HEUER and Hitoshi
Une, Defendants.

No. 86 C 9797.

United States District Court,
N.D. Illinois, E.D.

Oct. 31, 1988.

**174**

Steven J. Rotunno and Edward T. Joyce, Joyce & Kubasiak, P.C., Chicago, Ill., for plaintiff.

Joseph E. Coughlin, Lord, Bissell & Brook, Chicago, Ill., for defendants.

## ORDER

NORGLE, District Judge.

Before the court is defendant William H. Heuer's ("Heuer") motion for summary judgment. For the following reasons, the motion is granted.

## FACTS

In January, 1980, Heuer was employed by Osawa Precision Industries, a subsidiary of J. Osawa & Co. ("J. Osawa"), a Japanese trading company which specialized in camera equipment. In the spring of 1982, Heuer was assigned to Osawa & Company ("Osawa–Chicago"), a subsidiary of J. Osawa located in Chicago, Illinois. Osawa–Chicago primarily imported and distributed camera equipment. From the time he joined Osawa–Chicago, until June, 1983, Heuer held the position of senior vice-president, responsible for marketing, service and distribution operation. Osawa–Chicago had a separate financial department under the direction of Don Geyer, vice president of finance, and the treasurer, Mr. Katsuyama. In the spring of 1983, Hitoshi Une ("Une") became vice-president of finance and treasurer. In June, 1983, Heuer became president of Osawa–Chicago.

Plaintiff, the First National Bank of Boston ("Bank of Boston" or "Bank") is a financial institution with its principal place of business in Boston, Massachusetts, and was engaged, *inter alia*, in providing financing and credit to customers. In December, 1983, Bank of Boston approved a $2 million line of credit to Osawa–Chicago. The line of credit was for working capital and to permit Osawa–Chicago to import camera equipment using letters of credit issued by the Bank. Since Osawa–Chicago was located in the Chicago area, the letter of credit financing was provided by the Chicago branch of Bank of Boston International, a wholly-owned subsidiary of Bank of Boston with its principal place of business in New York.

During January and February, 1984, and pursuant to the line of credit, Bank of Boston loaned Osawa–Chicago $500,000 for working capital purposes and Bank of Boston International loaned Osawa–Chicago approximately $850,000 for letter of credit financing.

At the time the Bank extended the line of credit, it was aware that the loan was a risky one. It was aware that J. Osawa was not a "first tier" trading company in Japan, that Osawa–Chicago had sustained net losses and operating losses during the previous two years, that improvement in less than eighteen to twenty-four months was unlikely, and that the camera industry was intensely competitive. The Bank assigned a credit rating of "3" to the loan, indicating a weak credit rating.

In March, 1984, Osawa–Chicago went into bankruptcy because Bank of Boston and other creditors concluded that Osawa–Chicago should be liquidated. Thereafter, for reasons apparently unrelated to the bankruptcy of Osawa–Chicago, Bank of Boston International closed its Chicago branch office and transferred all its claims and interests relating to the Osawa–Chicago loans to Bank of Boston. Bank of Boston was paid substantial sums from the Osawa–Chicago bankruptcy proceeding, but approximately $350,000 in principal and interest remains unpaid.

Consequently, Bank of Boston brought this action against Heuer and Une in their individual capacities, alleging negligent misrepresentation of facts to the Bank in order to procure the line of credit.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A plaintiff cannot rest on mere allegations of a claim without any significant probative evidence which supports his complaint. *Id.; see First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims and defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Accordingly, the nonmoving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories and admissions on file to designate specific facts showing a genuine issue for trial. *Id.*

With this standard in mind, the court begins with the issue of choice of law. In a diversity case, a federal court is to apply the choice of law provisions of the forum state. *Klaxon v. Stentor Electric Manufacturing*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Thus, Illinois choice of law provisions apply here. The Illinois courts apply the "most significant relationship" test of the Restatement (Second) of Conflicts of Laws, incorporating a presumption that the law of the state where the injury occurred should apply. *Foster v. United States*, 768 F.2d 1278, 1280 (7th Cir.1980); *Ingersoll v. Klein*, 46 Ill.2d 42, 45, 262 N.E.2d 593 (1970).

The location of the injury in this case is a nebulous issue. It could be considered to be Illinois, the place where plaintiff entered into a contract in reliance on the alleged misrepresentations, or in Massachusetts, whence plaintiff relinquished its funds. *See Restatement (Second) of Conflicts of Laws* § 148 (1972) (Comment C). For this reason, in cases of fraud or misrepresentation, unlike personal injury actions, the place of the loss is less important than the place the defendant allegedly made the misrepresentations. *Id. See also Wilhoite v. Fastenware, Inc.*, 354 F.Supp. 856, 857 (N.D.Ill.1983) (Illinois law applies because contract containing allegedly fraudulent representations was made

in Illinois). In this case, the line of credit was negotiated in Illinois, and the statements alleged to be actionable were made in Illinois. Plaintiff cites *Autrey v. Chemtrut Ind. Corp.*, 362 F.Supp. 1085, 1090 (D.Del.1973) as contrary authority. Yet *Autrey* applies Delaware choice of law provisions, rather than Illinois provisions, and cites the First Restatement, rather than the Second Restatement.

The location of the parties slightly favors use of Illinois law. Defendant Heuer resides in Illinois. Defendant Une resided in Illinois at the time of the alleged conduct. Plaintiff's principal place of business is Massachusetts. However, plaintiff proceeds in part as successor-in-interest for the Chicago branch of Bank of Boston International, whose principal place of business was in New York. Also, the court finds that the fact that the line of credit agreement states that Massachusetts law shall apply is irrelevant in this case; this is an action in tort, not in contract, and Heuer, in his personal capacity, was not a party to the contract. Because the alleged misrepresentations were made in Illinois, and the other relevant factors balance in favor of Illinois, the court finds that Illinois law is applicable in this case.

Under Illinois law, a corporate officer cannot be held personally liable for contractually incurred corporate obligations unless the corporate officer fraudulently made misrepresentations which induced the plaintiff to enter into the contract. *Macaluso v. Jenkins*, 95 Ill.App.3d 461, 50 Ill.Dec. 934, 941, 420 N.E.2d 251, 258 (1981). The present case involves a contractual obligation to repay a loan. Plaintiff cites *McDonald v. Frontier Lanes*, 1 Ill.App.3d 345, 272 N.E.2d 369, 377 (1971) for the proposition that a corporate decision-maker is liable for corporate negligence within his/her control. However, *McDonald* involves a personal injury resulting from negligence by a corporation rather than a contractual debt, as is the case here. Any of a number of reasons could motivate the Illinois courts to establish a more rigid standard of liability for personal injury cases than for contractual

obligation cases, such as differences in ability to create contractual remedies in advance. The court also declines to apply to this case the rule stated in *Cross v. Wells Fargo Alarm Servies*, 82 Ill.2d 313, 45 Ill.Dec. 121, 123, 412 N.E.2d 472, 474 (1980), that when a person assumes a duty, it must be performed with due care. If Heuer undertook to provide financial information to plaintiff, it was in his capacity as a representative of the corporation, not in his personal capacity. Furthermore, *Macaluso* states a rule more specific to the facts of this case and involved facts more comparable to those in this case; *Macaluso* involved a corporate contractual obligation, while *Cross* involved allegedly inadequate police protection. Therefore, the court finds *Macaluso* to be applicable to this case. Because the court finds based on *Macaluso* that Heuer is only liable if he acted fraudulently, it need not reach the question of whether fraud must be alleged because plaintiff's claim is for "economic losses." *See Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). If it were to rule on that issue, the court would probably find that to the extent the bank had not recovered loaned principal, it sustained property loss, but to the extent it failed to recover expected interest, it sustained a loss of expected contractual profits, an economic loss.

The court finds that no reasonable finder of fact could infer fraudulent activity by Heuer from the evidence. The complaint does not allege fraudulent activity by Heuer; it merely alleges negligent misrepresentation. Nevertheless, the court will examine the major arguments forwarded by plaintiff to show fraud by Heuer.

Plaintiff points out that an internal memorandum dated November 19, 1982 predicted losses of $6.923 million for 1982, yet the end-of-year financial statement released to plaintiff shows a loss of $2.424 million. Plaintiff thus argues that the $2.424 million figure was inaccurate, and Heuer knew it was inaccurate, but provided it to the Bank anyway, without revealing the $6.923 million estimate. The court finds

that the discrepancy between the estimate and the outcome is not itself sufficient evidence to support a finding that the $2.424 figure was inaccurate. The estimate could have been based on different accounting methods, or could simply have been inaccurate. Osawa–Chicago's sales for 1982 were in excess of $54 million and 40 percent of its sales are generally made in the last 3 months of the year. Thus, a November estimate would not be conclusive, as Arimoto, the Bank's lending officer, admits. Plaintiff provides no other evidence that the $2.424 million figure was inaccurate.

The court further notes that Heuer's failure to volunteer the November prediction was not fraudulent. A prediction in November concerning the end-of-year losses is a prediction of a future event. In effect, it is an estimate of previous losses adjusted by a prediction of performance in December. Under Illinois law, a prediction of future profitability cannot constitute fraud. *Ziskin v. Thrall Car Mfg.*, 106 Ill.App.3d 482, 62 Ill.Dec. 255, 259, 435 N.E.2d 1227, 1231 (1982). The court finds, by analogy, that failure to volunteer a prediction cannot constitute fraud under Illinois law, although failure to volunteer factual information upon which the prediction is based could be fraudulent under certain circumstances. Also, as plaintiff has failed to provide evidence that the 1982 financial statement was inaccurate, there was no reason for Heuer to provide plaintiff an earlier estimate once it had the actual results.

Plaintiff alleges that Heuer told the Bank's lending officer, Kenro Arimoto ("Arimoto"), that 1983 operating losses through September 30, 1983 were approximately $2.479 million and he expected to break even for the year, but failed to inform Arimoto of an October 31, 1983 report showing an "operating loss" in excess of $11 million for the first ten months of 1983. Yet, the October 31 report shows an operating loss of only $1.885 million, an amount in line with a statement that the operating loss was $2.479 million after nine months and was expected to be reduced to zero three months thereafter. In addition, before the end of 1983, and before the loan was executed, Heuer informed Arimoto that Osawa–Chicago was unlikely to break even in operations for the year. The October 31 report shows a net loss (not a net operating loss) in excess of $11 million, but it is clear from the evidence that the $2.479 million figure, the early prediction of zero losses at the end of the year, and the focus of the Bank's general inquiry related to operating losses. As for plaintiff's general argument that Heuer should have revealed the internal financial statements of 1983, plaintiff presents no evidence that it requested any such statements.

Plaintiff claims Une told Arimoto, in Heuer's presence, that approximately $500,000 of the accounts receivable would be uncollectible, yet the actual amount was four or five times that amount, and Heuer's failure to contradict Une's prediction constitutes fraud. The court disagrees. Plaintiff has provided no evidence that the actual amount of uncollectible accounts exceeded $500,000. Furthermore, plaintiff has failed to provide any evidence that Heuer knew the actual amount would exceed $500,000; for a statement to be fraudulent, the speaker must know it to be incorrect. Finally, the statement was a prediction, and therefore not itself fraudulent.

Plaintiff argues that Heuer failed to inform the Bank that its barter receivables, usable for advertising, were overvalued and that Osawa–Chicago intended to use $2 million of those receivables. The only "evidence" that the barter receivables were overvalued is a letter from J. Osawa challenging the accounting method used to account for the receivables, and urging that the receivables be used. This alone is not sufficient for a jury to conclude that the barter receivables were fraudulently overvalued. Heuer testified that American accounting firms are divided as to how to account for barter receivables, and that J. Osawa did not understand barter receivables and was therefore uncomfortable with them. Plaintiff presents no evidence to the contrary. Also, the value of the barter

receivables was verified by an independent accounting firm.

The fact that Osawa–Chicago did not reveal its intention to use its barter receivables is irrelevant. It is obvious that by their nature advertising credits must be used; if they were never used, they would be worthless. Furthermore, absent evidence to the contrary, using advertising receivables is not wasting assets, as plaintiff implies. Presumably, advertising is a current expenditure which increases future sales, and as a result, future profits. Plaintiff presents no evidence that the contrary is true in this case. Hence, no reasonable jury could find fraud in Heuer's presentation of the barter receivables situation.

Plaintiff suggests Heuer acted fraudulently in failing to volunteer that $2 million of inventory had been estimated to be "unsalable." Yet Heuer further testified that "unsalable," simply meant not salable in its present condition: the "unsalable" inventory could usually be sold upon repackaging. Plaintiff provides no evidence to the contrary, nor does it provide evidence that the cost of making the inventory "salable" would be significant, i.e., that the omission was material.

Plaintiff contends that Heuer failed to disclose that the bad debt reserves were overstated. Yet the only evidence plaintiff presents purporting to demonstrate that those reserves were in fact overstated is the November 29, 1981 memorandum from J. Osawa, which simply recommends a reduction in reserves. On the other hand, an independent accounting firm assessed and verified the reserves. In any case, a reduction in bad debt reserves would show higher assets.

Finally, plaintiff claims that Heuer fraudulently predicted that J. Osawa would provide Osawa–Chicago additional capital, which J. Osawa failed to do. However, it is uncontroverted that Heuer never guaranteed a capital infusion; a statement that an infusion is likely implies that the absence of an infusion is also a possibility. Also, no evidence that Heuer knew that no

infusion was forthcoming has been presented; in fact, defendant has submitted evidence to the contrary. Furthermore, a false prediction is not fraudulent under Illinois law.

In sum, plaintiff has failed to provide enough evidence for a reasonable finder of fact to find that plaintiff has demonstrated, by the preponderance of the evidence, that Heuer acted fraudulently under Illinois law. Therefore, defendant Heuer's motion for summary judgment is granted.

IT IS SO ORDERED.